[No. 10459.   Department One.   January 24, 1913.]

R. E. DeKAY *et al.*, *Respondents*, v. NORTH YAKIMA & VALLEY RAILWAY COMPANY, *Appellant*.[1]

EMINENT DOMAIN—RIGHT TO COMPENSATION—OPERATION OF RAILROAD—DAMNUM ABSQUE INJURIA. Noises, and the jarring of buildings and the casting of smoke and cinders on adjacent property, necessarily incident to the operation of a spur track on a railroad company's land, and the alley abutting thereon under license from the city, is *damnum absque injuria*, and not a taking or damaging of the adjacent property.

SAME—PUBLIC USE—COMMERCIAL SIDE TRACKS—PRIVATE WAREHOUSE. In such case, it is immaterial that the city license to use the spur track was limited to the purpose of serving a commercial warehouse on private property, in view of Laws of 1911, p. 548, § 13, giving the right to maintain spurs for the use of a private shipper.

Appeal from a judgment of the superior court for Yakima county, Grady, J., entered October 30, 1911, in favor of the

[1]Reported in 129 Pac. 574.

plaintiffs, after a trial on the merits before the court without a jury, in an action to enjoin the maintenance and use of a railway track.   Reversed.

*Englehart & Rigg*, for appellant.

*Holden & Shumate*, for respondents.

PARKER, J.—The plaintiffs seek an injunction restraining the defendant from maintaining and using a spur track on its line of railway near their residence in the city of North Yakima, until such time as the defendant shall acquire, as against the plaintiffs, the right to so maintain and use such spur track by eminent domain proceedings.   From a decree in favor of the plaintiffs, the defendant has appealed.

The accompanying plat, which is a portion of one introduced in evidence, will aid in a correct understanding of the facts:

Respondents own lot six, on which they maintain their residence, and also a garage, on the northwest corner thereof. Appellant owns lots 7, 8, 9 and 10, on which it maintains its railway, and also a spur track, called "industrial track." Benjamin Young owns lot 11, on which he maintains a manufacturing plant and a warehouse contiguous to appellant's industrial track.   In June, 1911, when appellant commenced the construction of its industrial track upon the line indicated on the plat, respondents commenced this action.   While they prayed for a temporary injunction, we assume, from

the record before us, that none was issued. In any event, the industrial track was constructed some time before the trial of the cause upon the merits, which occurred in October, 1911. This track is used for a team track, at least as far as the alley, beyond which it appears to be used only for shipments to and from Young's warehouse. Before the trial, appellant had acquired from the city of North Yakima a franchise giving it the right to construct its industrial track across the alley, which franchise provided: "that said track shall only be used to serve the warehouse to be constructed and maintained on lot 11." This track is about nine feet from the northwest corner of respondents' lot, about 35 feet from the north line of their lot at its middle point, and about 50 feet from the northeast corner of their lot. Where the track crosses the alley, there is maintained a good plank crossing, so that travel through the alley is not interfered with in the least, except while cars or engines may be crossing the alley.

Respondents rest their right to have appellant restrained from maintaining and using its industrial track in such close proximity to their property, until it acquires the right so to do as against them by eminent domain proceedings, upon the damage which they allege results to their property from the smoke, fumes and cinders emitted and cast upon their property from engines running upon the track, and also from noise and vibration caused by the running of cars and engines upon the track. The nature and extent of this alleged damage is told in the testimony of respondent R. E. DeKay, as follows:

"Q. Now, can you state what effect the running of trains on this spur track has on your property with reference to smoke? . . . A. Why, we get smoke whenever they come in and the wind is right. Q. About how much smoke, Mr. DeKay? A. It is pretty hard to state. It varies in the amount according to how hard they work getting out. Q. Where are your bedrooms situated in this house? A. They are on the north side of the house. Q. Have you ever

opened your bedroom window when a train was on that spur track, an engine? A. Why, we have them open, as a rule, all the time. Q. State to the court what the effect was with the window open. A. I think it was Tuesday or Wednesday night my wife and I were in the room, sitting there, when the switch engine came in. There was enough smoke came in to fill the bedroom with smoke. . . . Q. Now, when did you say that was? A. Tuesday or Wednesday night, this week. Q. Have you noticed inconveniences from smoke on other occasions, Mr. DeKay? A. Yes, sir. Q. State what the facts are with reference to cinders. A. Well, there is more or less cinders. Of course we haven't noticed them so much as we have the smoke. They, as a rule, light on the ground or on the roof; considerable soot comes out with the smoke. Q. Have you noticed any soot in the rooms in your house? A. No, I don't know as I have. Q. Have you noticed any soot on the porch? A. Yes, I have noticed it around on the walks and clothes . . . Q. You do some washing out home, do you, Mr. DeKay? A. Yes, some. Q. And hang it out on a line in the rear of the lot? A. Yes. Q. State what effect smoke and cinders have on the clothing. A. Well, I haven't noticed the effect, except that I have seen them on the clothes . . . Q. Now, do they run trains in there at night? A. As a rule most of their switching is done nights. Q. What effect does that have upon you? A. Why, the noise wakes us up, as a rule, every time they come in. Q. Have you noticed any jarring or vibration? A. Yes, sir. Q. To what extent have you noticed vibration, Mr. DeKay? A. Well, three or four occasions in the last month I have noticed it enough to jar the window sills. That is a sign the house is well built. If it was a less substantial character there would have been more of it. Q. Now, what effect, if any, does the noise at night have upon you and your family? A. As a rule, it wakes all of us up. Q. About how often do they run trains in there, Mr. DeKay? A. Most every day; most every night."

Respondent Gertrude DeKay testified in part as follows:

"Q. Now, you may state what effect the running of trains has upon you and your property with reference to smoke. . . . A. Why, if the wind is toward the house the house is filled with smoke. A good deal depends upon the weather

and the prevailing winds. Q. Well, what are the prevailing winds, Mrs. DeKay? A. Usually from the northwest. Q. That would have the effect, then, of driving the smoke towards your property? A. In our bedroom windows, in our north windows. Q. You say your bedroom windows open to the north next to the track? A. Yes, all of our sleeping rooms open to the north. Q. Can you recall any particular time, Mrs. McKay, when you especially noticed smoke in your bedroom? A. Well, we heard the train coming—we sat at the window especially to notice so as to be sure just how the smoke came, and it came directly, was wafted into our bedroom window and filled our room full of black smoke; not only that room, but our dining room and the parlor was filled. Q. Now, Mrs. DeKay, state what the facts are from the running of trains, what effect it has with reference to soot. A. Well, any clothing that is out—the porches are covered with fine soot, the window sills, and so forth; any clothing that is on the line is covered with soot. Q. State whether or not there is any soot found in your rooms. A. Yes, sir; in dusting I notice it every day. Q. Now, what effect does the running of trains on the spur track have with reference to vibration? A. Well, the house vibrates, the windows shake, and we can notice it at night when we are lying in bed; we can notice the bed shake. Q. Do you notice any inconvenience from noises? A. Yes, sir."

We find no evidence in the record indicating any different or greater damage resulting to the property of respondents from the use of the industrial track than that shown by this testimony of the respondents. There is, however, some testimony of real estate men, showing the property to have a somewhat less market value because of the construction and use of the industrial track.

It is evident, from the prayer of the complaint and the argument of counsel for respondents, that they are not proceeding upon the theory that the use of appellant's industrial track is attended by any negligence, nor that its operation creates a nuisance; but that appellant may acquire the right to so cause such damages, as against respondents, by

eminent domain proceedings. They invoke the provision of § 16, art. 1, of our state constitution, which reads:

"No private property shall be taken or damaged for public or private use without just compensation having been first made, or paid into court for the owner."

The question of the correct construction of this provision, in so far as there is involved the nature of the damage which is required to be compensated for, was given consideration and exhaustively reviewed by this court in *Smith v. St. Paul, Minn. & M. R. Co.*, 39 Wash. 355, 81 Pac. 840, 109 Am. St. 889, 70 L. R. A. 1018. At pages 360, 362, we said:

"Applying to the constitutional provision in question the usual tests and rules, and having due consideration for the weight of judicial opinion, as we find it expressed by the courts that have passed upon this question, we are disposed to hold that the word 'damaged,' as used in our constitution does not give a right of action in a case where the injuries would have been, in the absence of said word, *damnum absque injuria* in an action against a natural person or private corporation. It would seem to be only reasonable to suppose that persons acquiring property in a thickly settled community must have anticipated the use of neighboring property in a manner not always to be agreeable and pleasant. A person buying property in a growing city must be presumed to have done so for the benefits to come to him by reason of being a property owner in such a city. The presence and operation of railroads are necessarily attendant upon the growth and prosperity of such a city as Spokane. Probably respondents would not have become property owners therein had it not been for the present and prospective railroad facilities of the city. As such purchasers and owners, they knew that more railways would be required as the city grew and became more important. The very growth and development which made city property, as a whole, more valuable, and opportunities for business prosperity greater, required the building and operation of more railway lines. No one could buy property in such a growing city without realizing that this would be a natural and necessary result. Where such new lines might be constructed, a person could not foretell. But he would know that they must be near other prop-

erty, and that their operation, however legitimate and careful, must entail consequential injuries upon the owners of such nearby property.   Electing to purchase property in such a community where his property might profit by the industrial and commercial activities of others, it is but just to hold that, with the advantages, he should also accept the burdens necessarily incidental thereto. . . .   The ringing of bells, sounding of whistles, rumbling of trains, and other usual noises, and the emission of smoke, gases, fumes, and odors are necessarily incidental to the proper operation of the road, and when not resulting from negligence, are such consequential injuries as must be held to have been anticipated by any one acquiring property in or about such a city, and are regarded as *damnum absque injuria.*"

The nature of the alleged damage there involved, aside from the question of negligence, was the same as that here involved.   If it differed in degree, it was only because the track of the railway was not so near to the property claimed to be damaged as in this case.   In both cases the track was maintained upon property belonging to the railway company, except in so far as the alley here involved is concerned.   The doctrine of that case was reaffirmed in *Clute v. North Yakima & Valley R. Co.*, 62 Wash. 531, 114 Pac. 513.   Except in so far as the alley crossing is concerned, it seems to us those decisions effectually dispose of the case in favor of appellant. The mere difference in the degree of injury resulting from the operation of the railway does not affect the principle involved.   Difference of damages in kind, or damages flowing from negligence on the part of appellant, would present a different question.

Some contention is made by counsel for respondents rested upon the provision of the franchise restricting the use of the alley crossing to the service of the warehouse, the argument being that this is a grant for a private purpose and is therefore void.   It is manifest that respondents have no such special property interest in that portion of the alley upon which the crossing is situated as they have in that portion

of the alley upon which their lot directly abuts. *In re Fifth Avenue etc.*, 62 Wash. 218, 113 Pac. 762; *Freeman v. Centralia*, 67 Wash. 142, 120 Pac. 886. The maintaining and use of a railway track in that portion of the alley upon which respondents' lot abuts would probably give them some ground for relief under our holding in *Lund v. Idaho & Wash. N. R.*, 50 Wash. 574, 97 Pac. 665, 126 Am. St. 916, but clearly that is not the question before us. In view of the close proximity of the crossing of the alley to respondents' lot, they possibly have the right to have the track so constructed across the alley at this point that the usual travel through the alley will not be obstructed or interfered with; but we are unable to see that their rights go beyond this, in any event. This being true, it may be well doubted that respondents are in any position to challenge the validity of the franchise ordinance. Indeed, it may well be doubted whether they would have any right to challenge the appellant's right to maintain this crossing, even though it were being maintained under a license created merely by sufferance on the part of the city. But, however that may be, it seems plain, under Laws 1911, p. 548, § 13, being a part of our public service commission law, that the railway company has the right to maintain such a track by consent of the city, even though it be maintained for the exclusive use of a private shipper. There is, however, nothing in this franchise ordinance which indicates that this warehouse is to be a private warehouse for the accommodation of its owner alone as a shipper. Indeed, there is evidence in the record indicating that it is intended to be a warehouse for the use of the public.

We are of the opinion that the judgment of the learned superior court must be reversed and the action dismissed. It is so ordered.

CROW, C. J., CHADWICK, GOSE, and MOUNT, JJ., concur.