[No. 20781.  Department One.  October 20, 1927.]

BARNETT B. BRADY *et al.*, *Respondents*, v. THE CITY OF
TACOMA, *Appellants*.[1]

[1] NUISANCE (2, 9) — DAMAGES — PRIVATE NUISANCES — ACTS CON-
STITUTING NUISANCES—NOISE—EVIDENCE.  A noise must be ma-
terial, substantial and unreasonable, before damages may be re-
covered for the taking or injuring of residence property through
the necessary humming sound in the operation of a city electric
substation, necessarily maintained near the center of a residen-
tial district to which city current must be distributed; and
findings of an actionable nuisance are not sustained by evidence
of a constant humming sound which was loud only in the
sense that it was at all times audible, especially at night, the
substation was not improperly or unreasonably located, and
replaced a woodyard which was as objectionable in the day-
time.

[2] SAME (2, 9).  In such a case, fear from a city's high voltage
transmission lines leading to its substation, is not ground for
the recovery of damages to residential property through the
maintenance of a nuisance; since such fear is without substan-
tial foundation.

Cross-appeals from a judgment of the superior court
for Pierce county, Remann, J., entered June 29, 1927,
upon findings favorable, in part to both parties, in
action for damages, tried to the court.  Reversed on
defendant's appeal.

*E. K. Murray, Leo Teats*, and *Bartlett Rummel*, for
appellant.

*Hayden, Langhorne & Metzger*, and *C. M. Lang-
horne*, for respondents and cross-appellants.

TOLMAN, J.—Respondents own, and occupy as a
residence, property across the street from and directly
facing the electric substation of the appellant city,
situated on block 103, Second School Land Addition
to Tacoma.  Transmission wires bring to this sub-

[1]Reported in 259 Pac. 1089.

station a voltage of one hundred and ten thousand, where it is stepped down by means of transformers for distribution and use in the city. It is conceded that the construction and equipment of the substation is standard throughout, and it is not contended that it is negligently operated in any particular.

Respondents, as plaintiffs, prosecuted the action upon the theory that there had been a taking or damaging of their property without compensation, in violation of our well known constitutional provision (§ 16, art. I) which has been so often quoted, in that their property was depreciated in market value and rendered less valuable for use by the unsightliness of the substation, the continuous noise attending its operation, and the potential danger to adjacent residents of injury or death from fallen wires or other causes incident to the operations.

The trial court held that there could be no recovery on account of the first and last causes; but found that the plaintiffs were damaged to the extent of four hundred dollars by reason of the continuous noise, and awarded them a judgment in that amount. The city has appealed from the judgment against it, and the plaintiffs have cross-appealed from that part of the judgment denying them a recovery because of the potential danger, and fear arising therefrom.

The city criticizes a number of the trial court's findings of fact, and since the case is triable here de novo, we have examined the evidence with care. It may be that, if necessary to reach a correct result, we would hold that, in some respects, the findings are not sustained by the evidence; but the conclusion arrived at on the main question raised by the city's appeal renders it unnecessary to discuss the evidence or disturb the findings, except as to a single word, which will later be referred to.

The findings which we think present the questions to be here discussed and determined are as follows:

"IV.  That subsequent to the time the plaintiffs purchased said property and began to reside thereon, the defendant purchased tract 'A' of block 103, of the Second School Land Addition to the city of Tacoma, and that said city erected thereon a certain electrical substation, the same being a part of the Cushman power system, for the purpose of receiving electrical power from the place of its generation, and to distribute it throughout said city of Tacoma; the said city of Tacoma owned, controlled and operated the said substation in both its public and private capacity for profit; that said substation consists of a large concrete building, located on tract 'B' of said block 103, and of numerous high steel towers carrying high tension wires, and other smaller structures and electrical appliances, located on that part of said lot 103, unoccupied by the aforesaid concrete building; that the same is surrounded by high steel wire fence, upon which are placed danger signs.

"V.  That there emanates from the said substation a loud humming or buzzing noise, which continues at all hours of the day and night, and which is clearly audible in and beyond the plaintiffs' residence; that it penetrates and is audible within the home of said plaintiffs at all times and that its effect is to damage and deteriorate the fair market value of plaintiffs' property to the extent of $400 and further that the effect of said humming or buzzing noise is to continually annoy and render uncomfortable many of the residents surrounding the said substation, who are within the distance in which the said noise is audible.

"VI-A.  That the substation erected on tracts 'A' and 'B' of block 103, of the Second School Land Addition to the city of Tacoma, by the defendant, the city of Tacoma, with its large concrete building, its steel towers carrying high tension wires, and its various other electrical appliances, etc., is unsightly; that the unsightliness of said substation renders the plaintiffs' property less desirable for residential purposes with

12—145 WASH.

the consequence that its fair market value has been decreased in the sum of $600.

"VI-B. That the substation erected by the said defendant, the city of Tacoma, is a source of fear to plaintiffs and surrounding residents due to the ever present possibility of an accident occurring to the apparatus within the substation, of fallen wires carrying high voltage or of other similar results incident to the operation; that such fear is without substantial merit in fact. .. . .

."IX. The court further finds that there is no potential danger from electrocution or otherwise outside the grounds of the substation itself."

The word which we criticize and reject is the word "loud" in the first clause of finding V. Without further explanation or limitation, the term is too elastic to correctly describe the condition. The noise is loud in the sense that it is audible on the respondents' property at all hours, but chiefly so at night, when other noises subside. It is not loud according to respondents' own testimony in that it drowns out other sounds, jars or stuns; but only is it thought to be disturbing because it is persistent, day and night, and is said to be disturbing to a nervous or sleepless person. We think with the word "loud" eliminated, the finding goes as far as the testimony on the part of the respondents, if taken as wholly true, will justify.

[1] The city contends that, upon these facts, the damages suffered by the respondents, if any, are *damnum absque injuria.* This, we think, is the principal question in the case, and if this contention is upheld, other errors assigned need not be discussed.

We have two lines of decisions which seem to affect the question. First, the so-called railroad cases, upon which the city relies; and second, the incinerator and mill cases, which the trial court attempted to follow.

The first in time, and perhaps the first in importance, is *Smith v. St. Paul M. & M. R. Co.,* 39 Wash. 355, 81

Pac. 840, 109 Am. St. 889, 70 L. R. A. 1018, the whole of which should be read in connection herewith, because, except that part applying to public streets, almost every word is applicable here. The gist of the holding is contained in the following:

"In the case at bar, appellant is operating its railway upon its own property except where the same crosses the public streets. No nuisance is alleged. Complaint is made of the ringing of bells, sounding of whistles, rumbling of cars, jarring of the earth, and the casting of cinders and soot upon, and smoke and fumes across, respondents' premises. They claim also to be injured by reason of the uncovered cuts through the cross-streets, and the wooden bridges over other of said cuts, which make the use of such streets more difficult.

"The jarring of the earth of respondents' lots and the casting of soot and cinders thereupon, and the emission of smoke physically injuring property, are injurious physical effects to the *corpus* of respondents' property, which, we think, come within the scope of the term 'damaged,' as used in the constitutional provision. If a railroad company cannot carry on its business upon its own property without necessarily disturbing the physical conditions of other property, it is evident that such company has not acquired sufficient property for the conduct of its business, and it should be required to pay such damages as the actual physical disturbance of the neighboring property entails thereupon. But the ringing of bells, sounding of whistles, rumbling of trains, and other usual noises, and the emission of smoke, gases, fumes, and odors are necessarily incidental to the proper operation of the road, and when not resulting from negligence, are such consequential injuries as must be held to have been anticipated by any one acquiring property in or about such a city, and are regarded as *damnum absque injuria.*"

The city is by statute authorized to construct and operate such a plant (Rem. Comp. Stat., § 9488), [P. C. § 1214], and our statute also provides:

"Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance." Rem. Comp. Stat., § 9916, [P. C. § 9131-71].

Under modern conditions, the city's plant is just as much a necessity to the community as is a railroad, and the production and distribution of electricity is a public use. *State ex rel. Chelan Elec. Co. v. Superior Court,* 142 Wash. 270, 253 Pac. 115. The testimony shows, without contradiction, that such a plant must be situated somewhere near the center of the district to be served, and there is nothing to indicate that this plant is improperly located; so in all respects the city is in as good a position as was the railroad in the *Smith* case. The *Smith* case was followed and affirmed in *In re Fifth Avenue,* 62 Wash. 218, 113 Pac. 762, and *Clute v. North Yakima & Valley R. Co.,* 62 Wash. 531, 114 Pac. 513, with respect more especially to the question of public streets; and was directly sustained and materially broadened upon the points here involved in *DeKay v. North Yakima & Valley R. Co.,* 71 Wash. 648, 129 Pac. 574, and *Taylor v. Chicago, Milwaukee P. S. R. Co.,* 85 Wash. 592, 148 Pac. 887, L. R. A. 1915 E 634, in which cases the rule of non-liability was extended to cover the jarring and casting of smoke and cinders upon adjoining property.

A question similar to the one we have here was discussed, and a rule identical in principle with the *Smith* case was applied, in *Crawford v. Central Steam Laundry,* 78 Wash. 355, 139 Pac. 56, but the *Smith* case and those which followed it were not mentioned. See, also, *Hieber v. Spokane,* 73 Wash. 122, 131 Pac. 478; and *Larned v. Holt & Jeffery,* 74 Wash. 274, 133 Pac. 460, 46 L. R. A. (N. S.) 635.

The departure from this rule, if there has been a departure, began with *Jacobs v. Seattle,* 93 Wash. 171, 160 Pac. 299, L. R. A. 1917B 329, known as the in-

cinerator case. The question was there raised by a demurrer to the complaint, and the ruling must be considered from that standpoint; for, if the complaint stated a cause of action in any respect, it was good, and the demurrer would not reach immaterial allegations. Judge Fullerton, in writing that case, stated the allegations of the complaint to be:

"That respondent, prior to the 5th day of May, 1913, installed upon property abutting and adjoining appellants' lot on the south an incinerator for the purpose of burning up and disposing of the garbage and refuse of the respondent city, which are brought to said incinerator from different portions of the city in open wagons; that the wagons pass alongside of appellants' property and frequently stand along its east line; that such wagons give forth noxious odors and are disgusting and sickening to the sight and senses; that said refuse and garbage are burned in said incinerator, by reason of which smoke, steam and vapors arise and permeate the air, noxious to the smell and other senses, which said odors are sickening, disgusting and unbearable, and tend to, and will, cause sickness and disease to those forced to smell and inhale the same; that, from such incinerated garbage and refuse, ashes and unburnt portions are carried out and dumped in close proximity to appellants' home; that the said refuse is composed mainly of decomposed and partly burned matter, which emits strong, disagreeable and noxious odors, detrimental to the health, peace and comfort of appellants and of any one living or being upon appellants' property; that, during the process of incineration, a large amount of cinders and ashes is carried up into the air and precipitated upon the property of appellants, covering appellants' home and yard and surrounding property; that by reason of the operation of said incinerator, flies congregate in great numbers upon and about appellants' home and in and about their house and other houses which they have upon said property, thereby breeding disease and filth and rendering the occupancy of appellants' property disagreeable to the senses and dangerous to health;

that respondent maintains an inclined roadway leading from said incinerator and alongside of appellants' property, which is unsightly and unseemly, and which lessens the value of their property; . . ."

It will at once be seen that a number of things here alleged are such as were held to be actionable in the *Smith* case, and some that were not held non-actionable in the *DeKay* and *Taylor* cases. In discussing these allegations, the court said:

"It may be conceded that the construction and operation of an incinerator by the city of Seattle for the disposal of garbage was a lawful exercise of municipal power under the delegation of authority granted by virtue of state legislation. But the lawfulness of the power would not warrant its exercise in such a way as to breach any constitutional guaranty for the protection of the citizen. The disposal of garbage may be a proper governmental function, granted by legislative enactment; but, conceding it to be so, the function must be exercised with due regard to constitutional limitations. Our constitution (art. 1, § 16) explicitly provides that private property shall not be damaged for public use 'without just compensation having been first made, or paid into court for the owner.' The complaint in this case sets forth the injury to the property of appellants arising from the erection, maintenance and operation of respondent's plant for the disposal of garbage on land adjoining that of the appellants, and 'that at no time has said city ever condemned plaintiffs' property nor has it ever brought any suit to establish or fix the damage to plaintiffs' property because of the erection, maintenance and operation of said incinerator, but said city has, without paying to plaintiffs, or having first fixed and ascertained by a jury, plaintiffs' damage,' so installed and operated said incinerator as to menace and depreciate the value of their property. The complaint does not seek to charge negligence of the respondent or its employees in the performance of governmental duties, in which case the municipality might be absolved from liability. The first cause of action is founded on the higher

ground of the taking or injury to property without just compensation. The authorities sustain the right of recovery in such cases.''

The *Smith* case and those which followed it were not cited or even mentioned, probably because it was thought that they were readily distinguishable; otherwise, no doubt they would have been overruled.

The last case bearing on the subject is *Bartel v. Ridgefield Lumber Co.*, 131 Wash. 183, 229 Pac. 306, 37 A. L. R. 683, where most of the cases we have referred to and many others are reviewed. The facts there showed that "smoke, sawdust and burned or half-burned embers" were cast upon adjoining property which caused material damage. Again, this was strictly within the rule of the *Smith* case, if not of the *DeKay* and *Taylor* cases. The late Judge Bridges, in his discussion in the *Bartel* case, said:

"The rule governing in the foregoing and many other cases is not that one may use his own property as he sees fit, so long as he uses it in the usual manner and without negligence, but that one may put his property to any use he sees fit, so long as he does not thereby materially damage someone else or his property, and that negligence is not the sole test of responsibility. Where a trade or business is carried on in such manner as to materially interfere with the reasonable and comfortable enjoyment by another of his property or which occasions material injury to the property itself, a wrong is done for which an action for damages will lie, without regard to the locality where such business is carried on and notwithstanding the business be entirely lawful, and notwithstanding the best and most approved appliances and methods may be used in the construction and management of the business.

"It is probable that the rule is, and ought to be, that before an action for damages may be maintained, the injury or inconvenience must be substantial, and that redress may not be had for every slight discomfort

or inconvenience. But the testimony here very clearly shows that the appellants' property has been damaged in a substantial manner, and as a direct result of the operation of respondent's mill."

It would seem that, in the use of the words "material" and "substantial," Judge Bridges was endeavoring to reach the point we feel we must here discuss. Respondents have argued that the humming sound penetrating to their property was a physical invasion, and perhaps, in a sense, it was. In the same sense, if the average householder in any urban community stands on his lawn and speaks to his child, calls his dog, or addresses a friend passing on the sidewalk, the sound of his voice will also invade his neighbor's property. But if these things be done in an ordinary and reasonable way, who will contend that they are actionable?

So with all commercial and industrial businesses. Certain sounds of the activities conducted will penetrate adjoining property. It now seems to us that, as to such sounds, before they can be held to be actionable, it must appear that they are material and substantial, and also unreasonable. In many, perhaps in most cases, this would require a showing of negligence in operations; but there are cases where such a plant has been located unreasonably and unnecessarily in a neighborhood devoted to other and inconsistent uses, or where insufficient property was acquired.

"The appellants may lawfully conduct the business anywhere if they will acquire a sufficient area so that the odors arising therefrom will be confined to their own property; or they may conduct it at such places where businesses of like kind are usually carried on— where the conduct of the business is not to drive people from their homes, or to depreciate or destroy the values of their property. But businesses of this sort may not be conducted at any place or at all places merely be-

cause it is lawful." *Grant v. Rosenburg,* 112 Wash. 361, 192 Pac. 889, 196 Pac. 626.

The *Bartel* and *Jacobs* cases fall into that class. In the *Smith* case, it is pointed out that, as to the matters held actionable, the railroad company had failed to condemn sufficient land. The difference, we think, between the *Jacobs* and the *Bartel* cases on the one hand, and the *DeKay* and *Taylor* cases on the other, lies in this: The casting of smoke and cinders was a necessary and reasonable concomitant of railway operations, and no reasonable acquisition of property would prevent it; and it was not shown that the railroad was improperly located. While in the later cases, a reasonable location in the first instance, or a greater extent of site, would have prevented an invasion detrimental to health in the one case, and likely to cause destructive fires in the other, both of which are material, substantial and unreasonable invasions.

But it is not necessary at this time to distinguish between these two lines of cases. If the *DeKay* and *Taylor* cases now stand unimpaired as the law, clearly respondents cannot recover. If those cases were overruled or modified by the *Jacobs* and *Bartel* cases, even so, the invasion for which recovery was had in this case so lacks the elements of materiality, substance and unreasonableness of the other cases as to make those cases inapplicable; and we therefore fall back on the *Smith* case, which clearly was not overruled by the *Jacobs* and *Bartel* cases, as furnishing the true rule to be here applied.

It cannot be held that the substation was improperly or unreasonably located. The ground on which it stands was, before the city acquired it, in part used as a location for a woodyard which operated a power saw and perhaps other machinery, and nothing is shown to indicate that the substation is any more ob-

jectionable than was the woodyard, though witnesses state that the woodyard might be considered temporary, while the substation is permanent. Nor is there anything to indicate the site was not sufficient in area. To acquire an entire block, surrounded by streets, for such a plant, which can invade neighboring property only by a humming sound, would seem to be entirely reasonable. To hold otherwise would be to stop all progress and invite a flood of litigation which would, we fear, destroy commerce and industry.

[2] Coming now to the cross appeal, the trial court found as a fact that there was no potential danger outside of the substation itself, and fear, if it existed, was without substantial foundation. We are satisfied that the evidence abundantly justified these findings. It clearly appears that the only possible accident which could have any effect outside of the station itself, must come from the transmission lines which enter and leave it. To hold that fear from that source is such as would warrant recovery, would be to make every property owner along every street over which the city has such a transmission line a prospective plaintiff in an action against the city.

Our previous decisions affecting this point are all reviewed and considered in *Ferry v. Seattle,* 116 Wash. 648, 200 Pac. 336, 203 Pac. 40; and accepting the law as defined in the opinion on rehearing in that case, we find, as did the trial court, that the evidence fails to establish a state of facts which will warrant a recovery.

The judgment against the city is reversed and the cause remanded, with directions to dismiss the action.

PARKER, ASKREN, and FRENCH, JJ., concur.

MITCHELL, J. (dissenting)—I dissent from the majority opinion as to the city's appeal. It holds, as I

understand, that while the respondents' property has been damaged four hundred dollars, as the trial court found, nevertheless such damages are *damnum absque injuria*. This class of cases has its difficulties and several of our most recent opinions upon this general subject, as well as the majority opinion in the present case, have been largely devoted to the studious if not delectable task of arguing away or criticising or distinguishing one or more of our many cases. Some of the cases deal with nuisances while others with damages to property. In all of them, however, I do not find any clear denial of the rule that the lawfulness of the power or the care with which it is exercised by the one complained of do not justify the breach of any constitutional guaranty for the protection of the citizen or his property. Under the provision of the constitution that private property shall not be taken or damaged for public or private use "without just compensation having been first made or paid into court for the owner" a municipality may put its property to any use it sees fit whether it employ the most approved appliances or not and whether it conducts its business in the most careful and skillful manner or not so long as it does not thereby materially or substantially damage the property of another. The constitution makes no distinction as to the manner of doing the damage or of motive, nor of the particular purpose for the taking of private property in case it is taken. One's lot or parcel of land worth four hundred dollars actually taken and appropriated is no more sacred against the doctrine "for the good of the public" than damage to that same extent caused to property not taken. One, such as a city, may use his property in a way, such as an electric substation, so as to substantially damage a given piece of property which at the same time on account of intervening distance or

some other barrier would be found and held as a matter of fact not to damage other property.

Suppose the establishment and operation of such an electric substation damaged private property situated within a foot of it to the extent of one thousand dollars, could there be no recovery? The principle involved in that kind of a case is precisely the same as the principle in this one—that is substantial damage as a matter of fact. Had the majority opinion said that the so-called damages were chimerical and fanciful only and not a fact the situation would be different, there would be no legal remedy. But such is not the case. The situation here is one wherein a strictly residential section of the city has been invaded by an establishment, useful and necessary it is true, to the substantial damage of respondents' property as a matter of fact, thus presenting a clear perception of the guaranty of the constitution which in my opinion should not be ignored.