[No. 12305.   Department One.   December 12, 1914.]

THE STATE OF WASHINGTON, *on the Relation of Washington Boom Company, Plaintiff,* v. CHEHALIS BOOM COMPANY, *Respondent.*[1]

EMINENT DOMAIN — PROPERTY SUBJECT — PREVIOUS DEVOTION TO PUBLIC USE—BOOM COMPANIES—PRIORITIES. The fact that a boom company, in order to initiate its appropriation, filed its map and survey in 1891, as required by Rem. & Bal. Code, § 7111, does not prevent the condemnation of a portion of its property by a rival boom company, where for twenty years the first company had made no use of more than one-tenth part of its appropriated shore rights, and there was no evidence that it would require the use of more than it had improved, while it appeared without question that the second company had immediate use and necessity for the shore rights it sought to condemn; the question being determined by the present or prospective use of the condemner, and the comparative advantages to the public and the condemner and condemnee.

Certiorari to review a judgment of the superior court for Chehalis county, Dykeman, J., entered September 9, 1914, denying the right of eminent domain, in proceedings to condemn shore rights to be used by a boom company in extending and maintaining its booming facilities. Reversed.

[1]Reported in 144 Pac. 719.

*John C. Hogan* and *A. E. Graham,* for relator.
*A. Emerson Cross* and *Glen Snider,* for respondent.

PARKER, J.—The relator, Washington Boom Company, seeks to acquire by eminent domain proceedings the right to extend and maintain its boom for catching, sorting, holding and delivering logs and other timber products in the waters of that portion of Preachers slough which runs in a northerly and westerly direction through section 21, township 17, range 8, in Chehalis county, as against the rights of the respondent, Chehalis Boom Company, the owner of the land in that section bordering upon the slough. The cause came on for preliminary hearing in the superior court for Chehalis county, upon the question of public use and the right of the relator to acquire the rights sought by it against respondent, Chehalis Boom Company. These questions being submitted upon the introduction of evidence in behalf of the respective parties, judgment was rendered by the court denying the right of the relator to acquire by eminent domain proceedings the rights sought by it as against respondent and dismissing the proceeding. The relator now seeks in this court reversal of this ruling and judgment of the superior court, by writ of review.

As we view the record before us, there is no room for serious controversy over the facts controlling the rights of the respective parties. Both of these boom companies are public service corporations, in that they are both organized under our statute requiring such companies to catch, hold and sort logs and timber products of all persons requiring such service, upon the same terms and without discrimination (Rem. & Bal. Code, § 7113 [P. C. 405 § 155]), and may acquire property necessary to their corporate purposes by right of eminent domain. Rem. & Bal. Code, §§ 7110 and 7120 (P. C. 405 §§ 149, 169). The Chehalis river, to which Preachers slough is tributary, is a large navigable river some thousand feet or more in width, running westerly through Chehalis

county into Grays Harbor.  Preachers slough is a navigable tributary of Chehalis river some two hundred feet in width. It flows in a sinuous course in a general westerly direction, receiving its waters from the Chehalis river at its southerly shore, and empties into the river a distance of some four or five miles below.  Both the river and Preachers slough, as well as other tributaries of the river in that neighborhood, are well suited to the carrying on of boom and logging operations therein.

Respondent, Chehalis Boom Company, was organized and incorporated in the year 1888, under the laws of Washington Territory.  Soon thereafter it constructed its boom at its present location, along the north shore of the Chehalis river opposite and above the mouth of Preachers slough. During a period of some three or four years following, respondent extended its boom until it occupied the north shore of the river for a distance of about two and one-half miles. Since then its boom has not materially changed in extent, nor occupied any other portion of the river or the tributaries thereof.  In the year 1890, it filed in the office of the secretary of state a plat of the river and tributaries thereof in the neighborhood of its boom, showing the shore line thereof it proposed to use for boom purposes.  This was done evidently with a view of complying with the law then existing relative to boom companies.  Laws of 1890, p. 470.  Thereafter, in December, 1891, it filed with the secretary of state an amended plat showing shore lines of the river and tributaries it proposed to use for boom purposes.  This amended plat is now relied upon by respondent as its appropriation of the waters of the river and tributaries for boom purposes.  This amended plat covers not only the portion of the river actually occupied by respondent's boom, but also covers over 40 miles of shore line of the main channel of the river and its navigable tributary streams and sloughs, including the larger portion of Preachers slough, but not including the portion of that slough flowing through section 28 on the south of

section 21, in which latter section the shore rights sought to be acquired by relator are situated.

About the year 1890, respondent drove two cavels in Preachers slough some distance above its mouth, evidently to aid in removing piling cut from its adjoining land.   It seems plain from the evidence that these cavels were never used in respondent's boom business, except possibly upon a very few occasions more than twenty years ago, when rafts were tied up to them.   These cavels, as shown by their conceded location as marked upon the plat exhibit, stood in the slough below section 21 and not opposite the shore rights which relator seeks to acquire.   These cavels rotted out and went adrift many years ago and have not been replaced.   No other use of any portion of Preachers slough has ever been made by respondent.   In December, 1888, respondent acquired title to all of the upland in section 21, and in June, 1911, it acquired the tide lands bordering upon Preachers slough in section 21.   Respondent has never, to any appreciable extent, received logs at its boom through Preachers slough.   Indeed, at an early date, respondent aided in obstructing the source of Preachers slough where it flows from the Chehalis river, a considerable distance above respondent's boom, so that logs and timber products would not float from the river into Preachers slough.   During the year 1913, respondent handled in its business approximately forty million feet of logs and timber products, and during the present year will handle approximately thirty-five million feet of logs and timber products.   In years past, the amount of logs and timber products handled by respondent exceeded these figures by a considerable amount.   Indeed, the necessity of the extension of respondent's booming facilities is apparently on the decrease rather than increase.   We are unable to gather from the evidence that respondent has any serious intention of constructing or maintaining in any portion of Preachers slough a boom or works of any nature to be used by it in connection with its boom business.

The relator, Washington Boom Company, was organized and incorporated in January, 1910. Soon thereafter relator acquired logging and boom facilities in Preachers slough where it flows through section 28 immediately to the south of section 21, and commenced business as a boom company. These logging facilities consisted of a log rollway from the tracks of the Oregon & Washington Railway Company to the waters of Preachers slough on the south shore thereof, and the shore rights along that portion of Preachers slough flowing through section 28. Logging had been carried on at this point for a number of years previous by private parties putting their logs in the slough for transportation to market. Appellant soon thereafter acquired and used in its logging operations additional shore rights at other points along Preachers slough. With the facilities thus possessed, relator has built up during its short life a business exceeding in amount that of respondent, handling in the year 1910, thirteen million feet of logs and timber products; in the year 1911, forty million feet; in the year 1912, fifty-five million feet, and in the year 1913, eighty-four million feet. It is plain that relator has necessity for additional facilities; that it needs the shore rights along Preachers slough in section 17, which it seeks to acquire from respondent by condemnation, and that it in good faith proposes to construct, extend and use its present boom along the entire length of that portion of Preachers slough which flows through section 21 and which is immediately below its boom. The increased logging operations in Preachers slough of recent years has been brought about largely by the building of the Oregon & Washington Railway, enabling logs and timber products to be transported by rail and placed in Preachers slough over relator's rollway in section 28. Before the organization of relator as a boom company, the logging operations in Preachers slough were carried on by private parties only.

17— 82 WASH.

No contention is made by counsel for respondent that there is any want of necessity on relator's part for acquiring the shore rights here involved; but the contention is that relator has not the right to acquire such shore rights as against respondent, since respondent's amended plat of appropriation filed in 1891 covers this portion of Preachers slough, and the upland and shore rights in section 21 are owned by respondent, a public service corporation.

The mere fact of ownership of this property by respondent, even though it is a public service corporation, is no impediment to the acquisition of such property through eminent domain proceedings by relator. It is not the mere ownership of property by a public service corporation that protects it from acquisition by another public service corporation seeking to acquire it for a public use by right of eminent domain; but the question of such a right of acquisition must find its answer in the present or prospective use of such property by the condemnee, the prospective use thereof by the condemner, the comparative advantages flowing to the public as between the ownership thereof by the condemnee and condemner, and the comparative advantage and disadvantages flowing to the condemnee and condemner by the ownership of such property. *State ex rel. Skamania Boom Co. v. Superior Court*, 47 Wash. 166, 91 Pac. 637; *State ex rel. Milwaukee Terminal R. Co. v. Superior Court*, 54 Wash. 365, 103 Pac. 469, 104 Pac. 175; *State ex rel. Everett & Cherry Valley Traction Co. v. Superior Court*, 59 Wash 598, 110 Pac. 428.

In this last cited decision we said:

"This court has repeatedly held that one public service corporation may condemn and take a portion of the right of way or property of another when there is a necessity therefor, and when the land sought to be condemned may be taken without material detriment or injury to the claimant corporation."

Counsel for respondent seem to rest its right to hold the shore rights upon Preachers slough in section 21, as against relator's claimed right to acquire them by condemnation, principally upon the filing of its amended plat of appropriation in the year 1891. Under the provisions of our boom statute, to initiate an appropriation of water for boom purposes by a boom company it must "file in the office of the secretary of state a plat or survey of so much of the shore lines of the waters of the state and lands contiguous thereto as are proposed to be appropriated for said purpose by said corporation." Rem. & Bal. Code, § 7111 (P. C. 405 § 151).

This has been the law since prior to the filing of respondent's amended plat in 1891. There is no specific provision of the statute limiting the extent of a claim of appropriation which may be thus made by a boom company, nor does the statute contain any provision touching the question of forfeiture under such an appropriation by reason of a failure to use the waters so claimed. This, however, cannot mean that respondent may lawfully hold under its appropriation plat, indefinitely, ten times as much water and shore line as it has been able to put to use in its boom business during any portion of the twenty-five years of its existence. The evidence in this case, as we have noticed, shows beyond dispute that less than one-tenth of the Chehalis river and its navigable tributaries measured lineally along their courses, within the boundaries of respondent's amended plat of appropriation, filed in 1891, has ever been used by it in its public service business. Counsel for respondent invoke the general rule that ordinarily mere nonuser will not result in forfeiture of the right of appropriation secured by the filing of a map of location by railway and boom companies. They call attention to, and rely upon, our decision in *Nicomen Boom Co. v. North Shore Boom & Driving Co.*, 40 Wash. 315, 82 Pac. 412. The language of that decision which seems to come nearest lending support to the contentions of counsel for respondent here is found on p. 330, as follows:

"Having thus acquired the first right to construct a boom within its located territory, and having, also, the right to anticipate future needs of the service it had undertaken for the public, what rights, if any, does appellant have in the remaining territory above its boom, as now constructed? It is evident that appellant never intended to abandon any part of its located territory. The court finds that it intended to extend its construction over this territory as necessity required. If there was an abandonment, it must have been by virtue of nonuse of the territory, in the way of failure to extend and operate the boom thereon. However, in the absence of legislative provision to that effect, mere nonuser does not of itself constitute an abandonment. It is held that, without such legislative provision, courts are not justified in fixing a limit at which mere failure to construct shall be held to be an abandonment. Abandonment is a question of intent, and while such intent may be found as a fact from long nonuse, yet the nonuse itself does not constitute an abandonment, and does not of itself defeat or impair acquired rights."

The facts are vastly different here. In that case the waters in dispute were immediately adjoining the boom within the plat of appropriation of the older company, which was about to proceed in good faith to actually extend its boom into the disputed waters. This was within a very few years after filing of its original plat of appropriation, and the disputed water was reasonably within the contemplated future needs of the company at the time of the filing of its plat of appropriation. Observations made by Justice Hadley, speaking for the court, on page 333 of that decision, foreshadow and point to the conclusions we here reach, as follows:

"It is said that the boom statutes contemplate that more than one boom may exist upon the same river. That is true, and thereby the legislature has made clear that it did not intend to authorize an unconstitutional monopoly of a stream. If, however, the available booming extent of a stream be such as to reasonably prevent the operation of more than one boom, the effect of a single location cannot well be avoided. Such circumstances would not make a monopoly authorized

by law as such, but the location would become the only one upon the stream by mere force of necessity. In any event, whatever may be the available booming extent of a stream, the legislature undoubtedly intended that those who in good faith venture to spend their money and become established as pioneers upon a stream shall be protected in the rights accorded them by virtue of their compliance with the location statute. It must have intended that, in the consideration of these rights, reference must be had to enlarged commercial necessities and to consequent future demands for public service. If the available extent of a river be such as to reasonably permit the operations of more than one boom company thereon, each will be protected in its location lawfully acquired, but prior rights must be protected. It is possible for a booming company, in an effort to hold an entire stream, to spread its plat of location over the whole available booming space thereon. If such were the manifest or apparent purpose, without regard to reasonable present and future necessities, it would be an attempted fraud against the state and the public which could not be upheld. Such a purpose does not appear on the part of appellant. Sufficient good faith appears to warrant its being protected in its location. The court finds that appellant's contemplated extension cannot be made and operated by reason of respondent's boom. The two cannot exist together."

It seems to us that the filing of respondent's amended appropriation plat in 1891 evidenced an apparent purpose to appropriate the waters of Chehalis river and its navigable tributaries without regard to the then present or reasonable future necessities of respondent's boom business. We do not say that such appropriation is other than valid, in so far as respondent has actually used and occupied the waters so attempted to be appropriated. But we are of the opinion that that appropriation, in the light of the long period of respondent's failure to use any portion of the waters of Preachers slough in its boom business, must be regarded as of no avail to it as against the eminent domain right of relator here sought to be exercised. The necessary conclusion is that the property rights of respondent, which relator

seeks to acquire by right of eminent domain, are simply private property rights, the title to which is in respondent, not devoted to public use and needed by relator for public use.

The judgment of dismissal is reversed, and the cause remanded to the trial court for further proceedings.

GOSE, MORRIS, MOUNT, and MAIN, JJ., concur.