

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE AUG 0 2 2018
Fairhurst
CHIEF JUSTICE

This opinion was filed for record

at 8 am on Aug 2, 2018

Susan L. Carlson
SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| CENTRAL PUGET SOUND REGIONAL TRANSIT AUTHORITY, a regional transit authority, dba SOUND TRANSIT, | ) ) ) ) | No. 94255-2 (consol. with No. 94406-7, No. 94530-6, and No. 95148-9) |

CENTRAL PUGET SOUND REGIONAL
TRANSIT AUTHORITY, a regional transit
authority, dba SOUND TRANSIT,

Respondent,

v.

WR-SRI 120TH NORTH LLC, a Delaware limited
liability company; WR-SRI 120TH LLC, a
Delaware limited liability company; SAFEWAY,
INC., a Delaware corporation; NORTHWESTERN
IMPROVEMENT COMPANY, a Delaware
corporation; CENTURYLINK, INC., a Louisiana
corporation fka PACIFIC NORTHWEST BELL
TELEPHONE COMPANY, a Washington
corporation; PUGET SOUND ENERGY, INC., a
Washington corporation; PPF AMILI 121ST
AVENUE NE, LLC, a Delaware limited liability
company,

Respondents,

CITY OF SEATTLE,

Appellant,

SEATTLE CITY LIGHT, a Washington municipal
corporation; CITY OF BELLEVUE, a Washington
municipal corporation; U.S. BANK NATIONAL
ASSOCIATION; PUGET SOUND ENERGY, INC.,
a Washington corporation; AF OPERATIONS,
LLC, a Delaware limited liability company;
AMAZON.COM INC., a Delaware corporation;
ORCA BAY SEAFOODS, INC., a Washington
corporation; KING COUNTY, a Washington

No. 94255-2
(consol. with
No. 94406-7,
No. 94530-6, and
No. 95148-9)

En Banc

Filed       AUG 0 2 2018

municipal corporation; and ALL UNKNOWN
OWNERS and UNKNOWN TENANTS,

    Respondents.

_____

CENTRAL PUGET SOUND REGIONAL
TRANSIT AUTHORITY, a regional transit
authority, dba SOUND TRANSIT,

    Respondent,
  v.

SAFEWAY INC., a Delaware corporation, King
County and All Unknown Owners and Unknown
Tenants,

    Other Parties,

CITY OF SEATTLE,

    Appellant.

_____

CENTRAL PUGET SOUND REGIONAL
TRANSIT AUTHORITY, a regional transit
authority, dba SOUND TRANSIT,

    Respondent,
  v.

STERNOFF L.P., a Washington limited
partnership; JPMORGAN CHASE BANK, N.A.,
W. STERNOFF LLC, a Washington limited liability
company dba BODYGLIDE; KING COUNTY, a
Washington municipal corporation; and ALL
UNKNOWN OWNERS and UNKNOWN
TENANTS,

    Other Parties,
  and

CITY OF SEATTLE,

2

Appellant. )
)
)
CENTRAL PUGET SOUND REGIONAL )
TRANSIT AUTHORITY, a regional transit )
authority, dba SOUND TRANSIT, )
)
Respondent, )
v. )
)
ANN SEENA JACOBSEN, who also appears of )
record as ANN SEENA VERACRUZ, individually )
and as trustee for THE ANN SEENA JACOBSEN )
LIVING TRUST DATED APRIL 4, 2002; )
ASSURITY LIFE INSURANCE COMPANY, a )
Nebraska company f/k/a WOODMEN ACCIDENT )
AND LIFE COMPANY; SAFEWAY, INC., a )
Delaware corporation; CENTURYLINK, INC., a )
Louisiana corporation; PUGET SOUND )
ENERGY, INC., a Washington corporation, )
)
Respondents, )
)
CITY OF SEATTLE, )
)
Appellant, )
)
SEATTLE CITY LIGHT, a Washington municipal )
corporation; CITY OF BELLEVUE, a Washington )
municipal corporation; KING COUNTY, a )
Washington municipal corporation; and ALL )
UNKNOWN OWNERS and UNKNOWN )
TENANTS, )
)
Respondents. )

WIGGINS, J.—These four consolidated cases present the same question: May

Central Puget Sound Regional Transit Authority (Sound Transit) condemn the city of

3

Seattle's electrical transmission line easements located in the city of Bellevue to extend Sound Transit's regional light rail system? For the following reasons, we affirm the trial courts in part and remand for further proceedings consistent with this opinion. We hold that Sound Transit has statutory authority to condemn Seattle's easements and that the condemnation meets public use and necessity requirements. However, we remand the cases to the trial court for consideration of the prior public use doctrine and a finding on whether the two public uses are compatible.

## FACTS AND PROCEDURAL HISTORY

### I. Factual History

Sound Transit seeks to build a light rail line perpendicular to 124th Avenue NE in Bellevue as part of its East Link Extension. To do so, it has condemned several properties located along 124th Avenue NE.

The properties at issue here are owned by Seattle and consist of electrical transmission line easements. Seattle acquired these easements 86 years ago specifically for the purpose of building electrical transmission lines. Seattle's easements run along the east and west sides of 124th Avenue NE, parallel to the road, which runs north to south. Two of the four cases, *WR-SRI*[1] and *Safeway*,[2] involve property on the west side of the road, where Seattle operates high-voltage

---

[1] *Cent. Puget Sound Reg'l Transit Auth. v. WR-SRI 120th N. LLC*, No. 94255-2. Sound Transit also refers to this parcel as the "Spring District I" property.
[2] *Cent. Puget Sound Reg'l Transit Auth. v. Safeway, Inc.*, No. 94406-7.

230-kilovolt transmission lines. The other two cases, *Jacobsen*[3] and *Sternoff*,[4] involve property on the east side of the road, where Seattle does not currently operate any transmission lines.[5]

The high-voltage 230-kilovolt transmission lines on the west side of 124th Avenue NE are part of a larger electrical transmission line corridor running 100 miles from electricity generating facilities on the Skagit River to an electrical substation in Maple Valley. This corridor is also part of a larger, regional electrical transmission line system that spans the West Coast.

Seattle does not currently operate or have definitive plans to build an electrical transmission line on the east side of 124th Avenue NE. But Seattle contends that the land will very likely be used to build a transmission line soon because of the growing demand for electrical transmission line capacity in the region and the scarcity of available corridors to locate such lines.

The parties dispute whether the condemnation will interfere with the existing electrical transmission lines or render the remaining easements unusable. Seattle claims that losing any of its west-side easements in the *WR-SRI* or *Safeway* cases would effectively render the transmission lines and the corridor useless. Specifically, Seattle argues that it would be unable to maintain mandatory clearances for its

---

[3] *Cent. Puget Sound Reg'l Transit Auth. v. Jacobsen*, No. 95148-9.
[4] *Cent. Puget Sound Reg'l Transit Auth. v. Sternoff LP,* No. 94530-6.
[5] For ease of reference, we refer to the different Clerk's Papers by the last three digits of the cause number in our court, e.g., 552 CP for case no. 94255-2; 067 CP for case no. 94406-7; 489 CP for case no. 95148-9; and 306 CP for case no. 94530-6.

transmission lines because Sound Transit has condemned Seattle's aerial easement rights.

In contrast, Sound Transit maintains that its light rail project will not preclude Seattle's future use of the easements. Specifically, Sound Transit alleges that Seattle would be able to use a particular design[6] for transmission towers that would comply with necessary clearances and conform to the new spatial limitations. Seattle does not currently use this model for its transmission towers and strongly disagrees that it is a feasible solution.

After Sound Transit resolved to acquire the properties for its East Link Extension project, it collaborated with Bellevue regarding the final project alignment, design, and construction process. To that end, Sound Transit and Bellevue executed a memorandum of understanding and related agreements. Sound Transit agreed to accommodate Bellevue's Bel-Red transportation improvement plan, which includes widening 124th Avenue NE. To do so, Sound Transit agreed to transfer much of the condemned property to Bellevue.

II. Procedural History

Seattle contested Sound Transit's condemnations by filing suit. The four trial courts ruled in favor of Sound Transit. In each case, the trial court held that Sound Transit had statutory authority to condemn Seattle's electrical transmission line easements and that the condemnations met public use and necessity requirements.

---

[6] Sound Transit argues that Seattle could build a monopole with braced insulators on its remaining easement.

6

In *WR-SRI*, *Safeway*, and *Sternoff*, the trial courts entered public use and necessity (PU&N) judgments, finding that Sound Transit had statutory authority to condemn the properties for its East Link Extension project. Additionally, the trial courts found that the East Link Extension project was a public use and that the public interest required the building of a light rail extension. Although Seattle submitted expert testimony that Sound Transit's condemnation was incompatible with the continued operation of the transmission lines, the trial courts failed to address the prior public use doctrine or the compatibility of the two agencies' public uses of the land. In *Safeway*, Seattle filed a motion for reconsideration that the public uses were incompatible, but the court denied it without explanation.

In *Jacobsen*, the trial court also entered a PU&N judgment, finding that Sound Transit had statutory authority to condemn public property for the East Link Extension. However, unlike the preceding cases, the court addressed the prior public use doctrine. It found that Seattle was not currently using the easements it holds on the property and that Sound Transit's proposed use of the condemned property would not destroy Seattle's future ability to use its remaining interests in the property for an electrical transmission system. The parties presented competing declarations about whether the uses would be compatible. The court found that the uses would be compatible with one another.

Seattle appealed all four of these cases, and the parties requested that they be consolidated. We granted review and consolidated the four cases to be determined at the same time. At the time we accepted review, a fifth case based on the same issues

7

was pending before the trial court. Seattle filed a notice of direct appeal to this court in that case. We granted review of that fifth case and stayed it pending this decision.

## STANDARD OF REVIEW

We review matters of statutory interpretation de novo. *State v. Armendariz*, 160 Wn.2d 106, 110, 156 P.3d 201 (2007).

## ANALYSIS

We affirm the trial courts in part and remand for a determination of whether Seattle's and Sound Transit's uses are compatible with one another. First, we hold that Sound Transit has statutory authority to condemn property owned by another political subdivision. Second, we hold that Sound Transit's condemnation satisfies PU&N requirements. Finally, we remand the cases for the trial courts to consider the prior public use doctrine and make factual determinations about whether the uses are compatible with one another.

I.  Statutory Authority To Condemn Seattle's Easements

For the following reasons, we hold that Sound Transit has authority to condemn property owned by another political subdivision, including Seattle's electrical transmission line easements.

a. *Principles of Statutory Interpretation*

The State can condemn property for public use. CONST. art. I, § 16. The State may also delegate this authority to its political subdivisions, such as cities or counties. *Pub. Util. Dist. No. 1 of Okanogan County v. State*, 182 Wn.2d 519, 534, 342 P.3d

308 (2015) (*Okanogan County PUD*)᠄ A political subdivision's authority to condemn property extends "only so far as statutorily authorized." *Id.* Therefore, the scope of the eminent domain authority of a governmental unit is a matter of statutory interpretation. *Id.*

Our first priority in statutory interpretation is to "ascertain and carry out the Legislature's intent." *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). We first examine the plain language of the statute "as '[t]he surest indication of legislative intent.'" *State v. Larson*, 184 Wn.2d 843, 848, 365 P.3d 740 (2015) (alteration in original) (quoting *State v. Ervin*, 169 Wn.2d 815, 820, 239 P.3d 354 (2010)). To interpret a statute's plain language, we examine the text of the statute, "as well as 'the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole.'" *Id.* (internal quotation marks omitted) (quoting *Ervin*, 169 Wn.2d at 820); *see also Campbell & Gwinn*, 146 Wn.2d at 11 (stating that "meaning is discerned from all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question"). We may not interpret a statute in a way that renders a portion "'meaningless or superfluous.'" *State v. K.L.B.*, 180 Wn.2d 735, 742, 328 P.3d 886 (2014) (quoting *Jongeward v. BNSF Ry. Co.*, 174 Wn.2d 586, 601, 278 P.3d 157 (2012)). Nor may we interpret a statute in a manner that leads to an absurd result. *Estate of Bunch v. McGraw Residential Ctr.*, 174 Wn.2d 425, 433, 275 P.3d 1119 (2012).

In addition to these general principles of statutory interpretation,[7] there are specific rules that guide our interpretation of eminent domain statutes. First, statutes delegating the power of eminent domain to a political subdivision must be strictly construed. *State ex rel. Devonshire v. Superior Court*, 70 Wn.2d 630, 633, 424 P.2d 913 (1967). Consequently, authority to condemn public property "must be given in express terms or by necessary implication." *King County v. City of Seattle*, 68 Wn.2d 688, 690, 414 P.2d 1016 (1966).

But, while we require grants of authority to condemn public property to be express or necessarily implied, we may not construe an eminent domain statute so strictly as to defeat the legislature's intent to grant condemnation power. *City of Tacoma v. Welcker*, 65 Wn.2d 677, 683, 399 P.2d 330 (1965).[8] Therefore, when interpreting eminent domain statutes, we must strike an appropriate balance between strictly construing authority to condemn property and ensuring that our interpretation does not defeat the legislative purpose to grant condemnation authority.

---

[7] Seattle also argues that its status as a home rule charter city grants it "complete local self-government in municipal affairs" and a special constitutional status with superiority to limited-purpose agencies like Sound Transit. Br. of Appellant City of Seattle (*WR-SRI*) at 33. Seattle contends that this argument is made in response to Sound Transit's "repeated suggestions in this case that it is the paramount power in the Puget Sound region." Reply Br. of Appellant City of Seattle (*WR-SRI*) at 27. However, Seattle fails to persuade us that its status as a home rule charter city is relevant to the statutory interpretation question before us. As a result, we conclude that Seattle's constitutional status does not affect our interpretation of the legislative authority granted to Sound Transit in RCW 81.112.080.

[8] *See also In re Condemnation Proceedings of City of Seattle*, 96 Wn.2d 616, 629, 638 P.2d 549 (*Westlake*) (1981) ("[A] statutory grant of [eminent domain] power is not to be so strictly construed as to thwart or defeat apparent legislative intent or objective."); *Devonshire*, 70 Wn.2d at 633 ("However . . . a statutory grant of such power is not to be so strictly construed as to thwart or defeat an apparent legislative intent or objective.").

### b. Express and Implied Authority To Condemn Property Owned by Other Subdivisions of the State

To exercise the power of eminent domain against a subdivision of the State, that power must be "express or necessarily implied." *King County*, 68 Wn.2d at 692. This test comes from the early case of *Seattle & Montana Railway Co. v. State*, 7 Wash. 150, 151, 34 P. 551 (1893). Here, the authority for Sound Transit to condemn Seattle's electrical transmission easements is express or, at the least, necessarily implied.

### i. Express Authority

To interpret the scope of Sound Transit's condemnation authority, we must first examine the actual statutory language. *See Dot Foods, Inc. v. Dep't of Revenue*, 166 Wn.2d 912, 919, 215 P.3d 185 (2009) ("Where statutory language is plain and unambiguous, we ascertain the meaning of the statute solely from its language."). The legislature granted Sound Transit express power to condemn all property necessary to build a light rail system:

> An authority[9] shall have the following powers in addition to the general powers granted by this chapter:
>
> . . . .
>
> (2) To acquire by purchase, condemnation,[10] gift, or grant . . . *all* lands, rights-of-way, property, equipment, and accessories necessary for such high capacity transportation systems.

---

[9] "Authority" refers to "a regional transit authority" authorized under chapter 81.112 RCW. RCW 81.112.020.

[10] Sound Transit exercises its right of eminent domain "in the same manner and by the same procedure" as first class cities. RCW 81.112.080(2).

RCW 81.112.080 (emphasis added). The use of the terms "all lands, rights-of-way, property" is a broad grant of power, which includes public property owned by political subdivisions of the State. But Sound Transit's authority to condemn public property is not limitless. While there may be no definitional limit to its authority to condemn "all . . . property," RCW 81.112.080(2), Sound Transit is still subject to other statutory limitations, as well as applicable common law doctrines.

As an example of limitations on Sound Transit, RCW 81.112.080(2) prohibits it from condemning existing public transportation facilities or properties without the consent of the condemnee. Sound Transit's authority is also restricted by the prior public use doctrine, which prohibits public entities from condemning property that is already being put to a public use. *Okanogan County PUD*, 182 Wn.2d at 538-39. As a result, while Sound Transit has authority to condemn public property, that authority cannot extend to existing public transportation facilities or land that is already being put to a public use.

ii.    Necessarily Implied Authority

In addition to an express grant of authority, the same statute, RCW 81.112.080(2), gives Sound Transit the implied power to condemn properties owned by other subdivisions of the State. After giving Sound Transit the power to condemn all lands, rights-of-way, and property, the statute continues:

> Public transportation facilities and properties which are owned by any city, county, county transportation authority, public transportation benefit area, or metropolitan municipal corporation may be acquired or used by an authority only with the consent of the agency owning such facilities. Such agencies are hereby authorized to convey or lease such facilities

*Cent. Puget Sound Reg'l Transit Auth. v. WR-SRI 120th N. LLC, et al.*
No. 94255-2 (consol. with No. 94406-7, No. 94530-6, and No. 95148-9)

        to an authority or to contract for their joint use on such terms as may be fixed by agreement between the agency and the authority.

RCW 81.112.080(2). The meaning of this provision is clear: the only way Sound Transit can acquire the property of another public transportation agency is with that agency's consent. If Sound Transit did not have the power to condemn public property, the legislature would not need to specify that the property of public transportation facilities can be acquired only by consent. Without the power of condemnation over public property, Sound Transit could obtain the property of any public agency *only* by consent.

In other words, this section of the statute is superfluous if Sound Transit does not have the power of condemnation over public agencies. We do not interpret statutes in a manner that renders them partially or wholly superfluous. *Cockle v. Dep't of Labor & Indus.*, 142 Wn.2d 801, 809, 16 P.3d 583 (2001).[11] Consequently, in order to give meaning to the entire statute, this clause necessarily implies that Sound Transit has the power to condemn public property unless that property is already being used for public transportation.

A statute also grants an agency necessarily implied authority to condemn public property when an interpretation that it lacks such authority would otherwise defeat the legislative intent or objective of the statute. *Devonshire*, 70 Wn.2d at 633. For example, in *Newell v. Loeb*, we concluded that a water commission had necessarily

---

[11] *See also Westlake*, 96 Wn.2d at 629-30 ("[A] statute delegating eminent domain power to a municipal corporation, containing both specific enumerations and general provisions, should be interpreted so no portion of it is superfluous, void, or insignificant.").

13

implied authority to condemn public land. 77 Wash. 182, 197-98, 137 P. 811 (1913). The water commissions had statutory authority to condemn "necessary and needed rights-of-way in the straightening, deepening, or widening, or otherwise improving of such rivers, watercourses or streams." LAWS OF 1911, ch. 11, § 7(d). We noted that at all times the water in those rivers and streams could be owned only by the State: "'[T]hat the running water in a great navigable stream is capable of private ownership is inconceivable.'" *Newell*, 77 Wash. at 201 (quoting *United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53, 69, 33 S. Ct. 667, 57 L. Ed. 1063 (1913)). Thus, when the statute gave water commissions the right to condemn "rivers, watercourses or streams," the statute necessarily implied that water commissions had the authority to condemn public property, because the water in those rivers and streams could only be public property. *Id.* at 199 (quoting LAWS OF 1911, ch. 11, § 7(d)).

Here, an interpretation that RCW 81.112.080 grants Sound Transit necessarily implied authority to condemn public property fulfills the legislature's intent. The legislature intended that Sound Transit plan and implement a high capacity transportation system in the central Puget Sound area—spanning multiple jurisdictions. RCW 81.112.010. The legislature recognized that a single agency, Sound Transit, would be most effective at building such a system. *Id.* It is inconceivable that the legislature did not know that building a massive multijurisdictional transit system would require passage through public land. In fact, the legislature explicitly requires Sound Transit to cooperate with other public entities that provide transportation services. *Id.* Thus, the legislature granted Sound Transit

authority to condemn "all land," adding only the caveat that Sound Transit must obtain consent to acquire other public transportation land. RCW 81.112.080(2). This ensures that the purpose of the statute, which is "the rapid development of alternative modes of travel," is not defeated. RCW 81.112.010.

For the foregoing reasons, we hold that Sound Transit has necessarily implied, if not express, authority to condemn property owned by another political subdivision.

iii.    Definition of Property in Eminent Domain Statutes

In response to these points, Seattle argues that we may not simply inquire into the ordinary definition of "property" in the statute because "property" has a specialized meaning in the eminent domain context. Specifically, Seattle argues that in an eminent domain statute "property" necessarily means "private property." As a result, it argues that it is insufficient to rely on the ordinary definition of those terms when interpreting the scope of Sound Transit's condemnation authority. After considering Seattle's authorities, we reject this argument.

When a legal term of art is used, we "turn[ ] to the technical definition of a term of art even where a common definition is available."[12] *City of Spokane ex rel. Wastewater Mgmt. Dep't v. Dep't of Revenue*, 145 Wn.2d 445, 452, 38 P.3d 1010 (2002). Seattle argues that in two prior decisions we have interpreted the word

---

[12] There are multiple examples of terms of art that have a specialized meaning in certain legal contexts. *See, e.g., Foster v. Dep't of Ecology*, 184 Wn.2d 465, 473, 362 P.3d 959 (2015) ("'Appropriation' is a term of art specifically used in the water rights context."); *El Cerrito, Inc. v. Ryndak*, 60 Wn.2d 847, 854, 376 P.2d 528 (1962) ("In the law of adverse possession, 'hostile' does not mean animosity, but is a term of art which means that the claimant is in possession as owner and not in a manner subordinate to the title of the true owner.").

"property" in eminent domain statutes more narrowly than its ordinary definition. Seattle relies on these cases to argue that property means only "private property" in the eminent domain context.

First, Seattle relies on our decision in *King County*, where we held that King County lacked authority to condemn a road owned by Seattle. 68 Wn.2d at 688-89. King County was authorized to condemn "land and property within the county for public use." RCW 8.08.010. Interpreting this language, we held, "Nowhere in RCW 8.08.010 is there an express or necessarily implied legislative authority for counties to condemn the property or rights of the state or any of its subdivisions." *King County*, 68 Wn.2d at 691-92. Accordingly, we concluded that "counties do not have the power to acquire by condemnation property owned by the state or a subdivision thereof." *Id.* at 692.

The *King County* case built on our decision in *Seattle & Montana Railway*, the second case on which Seattle relies. In *Seattle & Montana Railway*, several railroad corporations sought to condemn a right-of-way on state tidelands. 7 Wash. at 151. The railroads had "a right to enter upon any land, real estate, or premises," and the authority to condemn "so much of said land, real estate, or premises" as was necessary to construct rail lines. HILL'S GEN. STAT. §§ 1569, 1570. We held that the railroad corporations did not have authority to condemn public land under this statute:

> Our eminent domain act, as applied to railroads, must be construed, as are all such acts, as having regard only to the taking of private property, unless there is either express or clearly implied authority to extend them further.

*Seattle & Montana Ry.*, 7 Wash. at 151 (citations omitted). We did not find any express or implied authority in the statute empowering railroad corporations to exercise eminent domain over public property. *Id.* at 153.

Neither *King County* nor *Seattle & Montana Railway* held that the word "property" in an eminent domain statute is necessarily defined as private property. Instead, *Seattle & Montana Railway* created the test, which was applied in *King County*, that the authority to condemn public property must be expressly granted or necessarily implied. *Id.* at 151. We apply that same test here and conclude that there is express and/or implied authority for Sound Transit to condemn Seattle's property.

An additional factor distinguishes this case from *Seattle & Montana Railway*, in which privately owned railroad companies attempted to condemn state-owned tidelands. *Id.* at 151-52. In contrast, Sound Transit does not seek to condemn state-owned land, but the property of a fellow municipal corporation. The State, by virtue of its position as sovereign, enjoys more privileges and protections when it comes to eminent domain than those enjoyed by its political subdivisions. *See State ex rel. Eastvold v. Superior Court*, 44 Wn.2d 607, 608, 269 P.2d 560 (1954) ("[T]he state, acting as a sovereign, has many inherent powers not possessed by municipal corporations, and few of their limitations."). We also noted in *Seattle & Montana Railway* that "the public will have no practical enjoyment of any part of [the railway] except at street crossings." 7 Wash. at 155. But here, Sound Transit is building a system whose sole purpose is to benefit the public. RCW 81.112.010. As a result, the

concerns that we had in *Seattle & Montana Railway* are simply not present in this case.

Finally, Sound Transit's grant of condemnation authority is different from the authority granted to King County and the railroad corporations. Unlike King County in *King County*, which had authority "to condemn land and property," RCW 8.08.010, or the railroad corporations in *Seattle & Montana Railway*, which had authority to "enter upon any land, real estate, or premises . . . [and] appropriate so much of said land," HILL'S GEN. STAT. §§ 1569, 1570, Sound Transit has authority to condemn "*all* lands, rights-of-way, property," RCW 81.112.080 (emphasis added). Sound Transit argues that "all" is a sufficient grant of authority to condemn public lands. We agree, but explain below that there may be limitations on the power of eminent domain, such as the prior public use doctrine, discussed *infra*.

### c. No Absurd Results

Seattle also claims that absurd consequences will result if we interpret RCW 81.112.080 as granting Sound Transit authority to condemn property owned by another political subdivision. We must interpret statutes to avoid absurd results. *See, e.g., Ervin*, 169 Wn.2d at 823-24 ("It is true that we presume the legislature does not intend absurd results and, where possible, interpret ambiguous language to avoid such absurdity."). Here, none of Seattle's predicted consequences sink to the level of absurdity.

First, Seattle argues that interpreting "all . . . property," RCW 81.112.080(2), to include public property would permit Sound Transit to condemn any and all public

land, including the Washington State Capitol, tidelands, highways, water treatment facilities, etc. Seattle maintains that the legislature could not have intended to convey such broad condemnation authority to Sound Transit. We relied on similar reasoning in *Seattle & Montana Railway*, where we found that it would be inappropriate to interpret a statute in a way that authorized railroads to condemn public property:

> [B]ecause a railroad is authorized to enter upon and condemn "any" land for its tracks, depots, shops, round houses, etc., it could by serving notice upon the auditor of Thurston county, take the entire 10 acres upon which the state capitol stands for a depot and shops.

7 Wash. at 152. Ultimately, we rejected an interpretation that would grant such broad condemnation authority to the railroad corporations.

Even if Sound Transit has broad authority to condemn public property, its authority is still constrained by other applicable doctrines, such as the prior public use doctrine.[13] The prior public use doctrine bars the condemnation of property that is already being put to a public use unless both uses are compatible. *Okanogan County PUD*, 182 Wn.2d at 538-39. Here, Seattle's examples all constitute public property that is being put to a public use. Under the prior public use doctrine, Sound Transit would not be able to condemn Seattle's example properties even if it possesses the authority to condemn public property generally. As a result, this is not a realistic result, let alone an absurd result.

Second, Seattle argues that if we interpret "all . . . property" as an express grant of authority to condemn public lands, we would implicitly grant several other political

---

[13] The prior public use doctrine is discussed in further detail *infra*.

subdivisions, like mosquito control districts, the power to condemn public land. *See* RCW 17.28.160(3) (granting mosquito control districts the authority to condemn "any lands, rights-of-way, easements, property, or material").[14]

Again, the authority of other political subdivisions is constrained by applicable doctrines such as the prior public use doctrine. In addition, the authority to condemn public property must be expressly given or necessarily implied. *King County*, 68 Wn.2d at 691-92. We do not address either element as it relates to political subdivisions other than Sound Transit.

Here, Sound Transit has been granted the authority to acquire private property and property owned by another political subdivision in order to construct a regional transit system; however, that authority is not limitless or without safeguards and does not sink to the level of absurdity.

## II. Public Use and Necessity

Having determined that Sound Transit has statutory authority to condemn property owned by another political subdivision, we now analyze whether the condemnation here meets PU&N requirements. When evaluating PU&N, we analyze two[15] things: first, we must decide whether the proposed use is public, and second, we must determine whether the property to be acquired is necessary for the public

---

[14] *See also* RCW 87.03.140 (granting irrigation districts the right to condemn "all lands, waters, water rights, and other property").

[15] While many of our cases refer to the PU&N test as having three steps, usually the last two considerations are analytically collapsed into a single "necessity" inquiry. *See, e.g., Pub. Util. Dist. No. 2 of Grant County v. N. Am. Foreign Trade Zone Indus., LLC*, 159 Wn.2d 555, 573, 575-78, 151 P.3d 176 (2007).

interest. *Pub. Util. Dist. No. 2 of Grant County v. N. Am. Foreign Trade Zone Indus., LLC*, 159 Wn.2d 555, 573, 575-78, 151 P.3d 176 (2007). A legislative determination of necessity is "'conclusive in the absence of proof of actual fraud or arbitrary and capricious conduct, as would constitute constructive fraud.'" *Id.* at 575-76 (quoting *In re Condemnation Pet. of Seattle Popular Monorail Auth.*, 155 Wn.2d 612, 629, 121 P.3d 1166 (2005)).

Here, Sound Transit's proposed use of the property for public transportation is a public use. There is no evidence of arbitrary and capricious action by Sound Transit, nor is there proof of actual fraud. As a result, we hold that Sound Transit's condemnation meets the requirements of PU&N.

### a. Proposed Public Use

"The question of whether the use is really a public use is a judicial determination." *Id.* at 573. Here, there is no question that Sound Transit's proposed use of the property—public transportation—constitutes a public use. *Seattle Popular Monorail Auth.*, 155 Wn.2d at 630 ("[I]t is undisputed that the use to which the property is to be put—public transportation—is a clear public use. Indeed, public transportation has been determined to be public use for nearly 100 years in Washington." (citation omitted)).[16] As a result, we hold that Sound Transit's proposed use to build a light rail is a public use.

---

[16] *See also Devonshire*, 70 Wn.2d at 636 ("Public transportation has long been recognized as a public use within the contemplation of the power of eminent domain.").

*b. Necessary for the Public Purpose*

"[W]hether the condemnation is *necessary* is a legislative question." *Cent. Puget Sound Reg'l Transit Auth. v. Miller*, 156 Wn.2d 403, 417, 128 P.3d 588 (2006). Consequently, "[a] legislative body's determination of necessity is conclusive unless there is proof of actual fraud or arbitrary and capricious conduct amounting to constructive fraud or the government fails to abide by the clear dictates of the law." *Id.* We review the trial judge's factual findings supporting public necessity under our substantial evidence standard. *Id.* at 419. "Substantial evidence is viewed in the light most favorable to the respondent and is evidence that would 'persuade a fair-minded, rational person of the truth of the finding.'" *Id.* (quoting *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994)).

Here, there is no evidence of actual fraud or arbitrary and capricious conduct amounting to constructive fraud. Nor does Seattle allege that Sound Transit has acted fraudulently or in an arbitrary and capricious fashion. Instead, Seattle argues that Sound Transit has failed to abide by the clear dictates of the law by condemning excess land that is not "necessary for . . . high capacity transportation systems." RCW 81.112.080(2). Specifically, Seattle argues that 88 percent of the land that Sound Transit is condemning will be transferred to Bellevue for road construction.

Generally, we avoid questioning the condemning authority's determination "as to the type and *extent* of property interest necessary to carry out the public purpose." *Seattle Popular Monorail Auth.*, 155 Wn.2d at 630 (emphasis added). In addition, "necessity" in the eminent domain context does not mean absolute necessity:

The word "necessary," when used in or in connection with eminent domain statutes, means reasonable necessity, under the circumstances of the particular case. It does not mean absolute, or indispensable, or immediate need, but rather its meaning is interwoven with the concept of public use and embraces the right of the public to expect and demand the service and facilities to be provided by a proposed acquisition or improvement. Reasonable necessity for use in a reasonable time is all that is required.

*Welcker*, 65 Wn.2d at 683-84 (citations omitted). In particular, we have held that site selection is not subject to judicial interference: "[S]ite selection is essentially a legislative question, not a judicial one. Courts give especial deference to agency site selection decisions because courts 'are not trained or equipped to pick the better route, much less design and engineer the project.'" *Miller*, 156 Wn.2d at 421-22 (quoting *Deaconess Hosp. v. Wash. State Highway Comm'n*, 66 Wn.2d 378, 405, 403 P.2d 54 (1965)).

Here, Sound Transit has shown that its condemnation is "necessary" for its light rail project. It adopted resolutions authorizing the condemnation as needed for the East Link Extension. To accommodate the light rail crossing, Bellevue must construct a bridge over the tracks. The other road improvements will serve the needs of the public for the future and ensures that the initial design will meet the future development goals of Bellevue. Because the project is undoubtedly a public use, we do not and should not question the substantive aspects of the project. As a result, we hold that Sound Transit's condemnation meets public necessity requirements.

III. Prior Public Use Doctrine

The final question we must answer is whether the prior public use doctrine bars Sound Transit's condemnation of Seattle's electrical transmission line easements. Under the prior public use doctrine, a condemnor may not condemn property already being used for a public purpose if the proposed use "will either destroy the existing [public] use or interfere with it to such an extent as is tantamount to destruction." *Okanogan County PUD*, 182 Wn.2d at 538-39. However, "the prior public use doctrine does not apply when the prior use is compatible with the proposed use." *Id.* at 540. Thus, we must decide two things: (1) whether Seattle's use of the properties is a public use and, if so, (2) whether Sound Transit's proposed use is compatible with Seattle's use.

Here, Seattle's use of the electrical transmission line easements constitutes a prior public use. However, three of the four trial courts failed to address whether Sound Transit's proposed use and Seattle's current use of the properties are compatible. The compatibility of an electrical transmission line and a light rail is a factual question suited for a trial court, not an appellate court. As a result, we remand the issue to the trial court for further proceedings.

*a. Prior Public Use*

First, we must decide whether Seattle's current use of the properties is for a public purpose. "The generation and distribution of electric power has long been recognized as a public use by this court." *Carstens v. Pub. Util. Dist. No. 1 of Lincoln County*, 8 Wn.2d 136, 143, 111 P.2d 583 (1941). Thus, Seattle's operation of

transmission lines on the WR-SRI property and the Safeway property to distribute electricity is a public use.

However, Seattle does not currently operate any electrical transmission lines on the Jacobsen property or the Sternoff property. Nor does Seattle have any defined plans to build a line on those properties in the near future. Because Seattle does not currently transmit electricity on these properties, Sound Transit argues that Seattle is not using them for a public purpose.

Seattle disagrees, arguing that prior case law establishes that even though there are no current transmission lines on the properties, the acquisition of property for the purpose of generating and distributing electricity is a public use. *See Pub. Util. Dist. No. 1 of Chelan County v. Wash. Water Power Co.*, 43 Wn.2d 639, 643, 262 P.2d 976 (1953) ("The appropriation of water and facilities for the generation of electrical power, to be sold to the public generally by an entity entitled by statute so to do, is a public use."); *State ex rel. Nw. Elec. Co. v. Superior Court*, 28 Wn.2d 476, 483, 183 P.2d 802 (1947) ("We have uniformly held that the acquisition of properties by a public utility district, for the purpose of furnishing electricity to the public, is a public use."); *Brady v. City of Tacoma*, 145 Wash. 351, 356, 259 P. 1089 (1927) ("Under modern conditions, the city's plant is just as much a necessity to the community as is a railroad, and the production and distribution of electricity is a public use.").

However, these prior cases all involved a determination of whether generating and distributing electricity is a public use such that the party intending to distribute the

electricity had the power to condemn the land for that use. Here, the question is different: Is property previously acquired for the purpose of distributing electricity, but not currently being used for that purpose, being put to a public use?

To be considered a public use, the prospective public use must be concrete and nonspeculative: "Reasonable expectation of future needs and a bona fide intention of using it for such purposes within a reasonable time are required to protect property from condemnation." *State ex rel. Polson Logging Co. v. Superior Court,* 11 Wn.2d 545, 567, 119 P.2d 694 (1941). Further, "'[a] future use that rests upon conjecture or a contingency should yield to the more immediate necessity of the company seeking condemnation.'" *Id.* at 567-68 (quoting 18 AM. JUR. *Eminent Domain* § 96 (1938)). For example, in *Polson*, a logging company sought to condemn a right-of-way over property owned by a rival logging company. *Id.* at 549-50. The rival logging company objected to the condemnation, insisting that it was going to use the same land to build a road. *Id.* at 548-49. We held that the logging company had authority to condemn the rival logging company's land. *Id.* at 567. We noted that despite the contention that the rival logging company might use the land again in the future, all evidence indicated that the land had been "abandoned" and that "there was not the remotest probability" that the land would be used by the rival logging company for a road. *Id.* at 563.

Yet, "mere nonuse[ ]" does not necessarily result in abdication of a public entity's property rights. *Nicomen Boom Co. v. N. Shore Boom & Driving Co.,* 40 Wash. 315, 330, 82 P. 412 (1905). Instead, the question is one of intent—whether the entity

has a bona fide intention of using the land for a public purpose in a reasonable amount of time. *Id.* As a result, "courts are not justified in fixing a limit at which mere failure to construct shall be held to be an abandonment." *Id.* Instead, "[t]he state has the right to proceed in its own time and in its own way to improve its property, and its [reasonable] delay in so doing can convey no legal right in the property to others which such others would not have possessed had the delay not have occurred." *State v. Superior Court*, 91 Wash. 454, 460, 157 P. 1097 (1916).

Here, despite the land not currently being used to transmit electricity, we hold that it is being put to public use. Seattle's easement was acquired 86 years ago for the express purpose of transmitting electricity. As amici point out, "[e]lectric utilities have to plan long term for future needs. Providing electricity is an extremely capital intensive business, and requires long range planning for future growth and future infrastructure. . . . Most electric utilities use twenty-year or longer time horizons." Br. of Amicus Curiae at 10-11. For example, the Twisp transmission line that was at issue in *Okanogan County PUD* was announced in 1996 and ended with a decision from this court in 2015. *Id.* at 11 n.17. Amici further explain that "[t]here is unique and irreplaceable value in an electric transmission corridor," and because assembling the necessary land and property rights to create an electric transmission corridor can be very difficult, "most are acquired with necessary future requirements" in mind. *Id.* at 15. We recognized this reality over a century ago:

> It is manifest that any public service corporation, when installing an electric plant, must anticipate future as well as present needs of the public . . . . If this could not be done, the logical result would be that,

every time it secured additional public service contracts or was called upon to furnish additional power for an undoubted public use, it would be compelled to institute further condemnation proceedings, acquire additional property, enlarge its plant, increase its output, and thus meet the increased demands for public use. . . . [S]uch a procedure would be unbusinesslike and impracticable.

*State ex rel. Lyle Light, Power & Water Co. v. Superior Court*, 70 Wash. 486, 490, 127 P. 104 (1912).[17]

For these reasons, despite having no immediate plans to begin building a transmission line, it is clear that Seattle intends to use this land to transmit electricity, the public use for which it was acquired. Given the complex logistics of building an electric transmission corridor, Seattle's clear intention to use this land for that purpose constitutes a "[r]easonable expectation of future needs" and a "bona fide intention" of using the land to transmit electricity. *Polson*, 11 Wn.2d at 567. Therefore, we hold that all four properties—those on which an electrical transmission line is already built, and those currently unused—are being put to a public use.

### b. Compatibility

Having concluded that Seattle's easements are being put to a public use, we must now decide whether Sound Transit's proposed public use is compatible with Seattle's use. "[T]he prior public use doctrine does not apply when the prior use is compatible with the proposed use." *Okanogan County PUD*, 182 Wn.2d at 540. Thus,

---

[17] *See also Nicomen Boom Co.*, 40 Wash. at 329-30 (concluding that public service corporations "may anticipate future necessities and may, for that purpose, hold territory not in actual use, to the exclusion of other companies").

whether the prior public use doctrine applies here depends on the compatibility of the two uses.

Although the question of compatibility is different from the question of public necessity in condemnation proceedings, similar considerations are involved. Thus, we consider the question of compatibility, like the question of public necessity, to be one for the trial court. *See Miller*, 156 Wn.2d at 419 (noting it is for the trial judge to weigh the evidence supporting public necessity). "As the party challenging the trial court's factual findings," Seattle has "the burden to prove they are not supported by substantial evidence." *Blackburn v. Dep't of Soc. & Health Servs.*, 186 Wn.2d 250, 256, 375 P.3d 1076 (2016). A trial court's factual findings are supported by substantial evidence when there is sufficient evidence "'to persuade a rational, fair-minded person of the truth of the finding.'" *Id.* (internal quotation marks omitted) (quoting *Hegwine v. Longview Fibre Co.*, 162 Wn.2d 340, 353, 172 P.3d 688 (2007)). When there is substantial evidence supporting a trial court's factual findings, we "'will not substitute [our] judgment for that of the trial court even though [we] might have resolved a factual dispute differently.'" *Id.* (quoting *Sunnyside Valley Irrig. Dist. v. Dickie*, 149 Wn.2d 873, 879-80, 73 P.3d 369 (2003)).

For example, we held that two public uses were compatible in *City of Tacoma v. State*, 121 Wash. 448, 209 P. 700 (1922). Tacoma sought to condemn state land along the Skokomish River to build a hydroelectric plant. *Id.* at 449. As part of its condemnation plan, Tacoma needed to divert river water away from a state fish hatchery. *Id.* at 453. The State argued that the diversion would destroy the utility of

the fish hatchery. *Id.* We held that the fish hatchery was a public use, but there was sufficient evidence that even with the diversion, there would be enough water for the hatchery operation. *Id.* As a result, we held that the two public uses were compatible with one another. *Id.*

In contrast, uses are incompatible "when the proposed use will either destroy the existing use or interfere with it to such an extent as is tantamount to destruction." *Okanogan County PUD*, 182 Wn.2d at 538-39 (quoting 1A JULIUS L. SACKMAN, NICHOLS ON EMINENT DOMAIN § 2.17, at 2-58 (3d ed. 1964)). For example, in *Nicomen*, 40 Wash. 315, we concluded that two public uses were incompatible with one another. North Shore, a logging company, sought to construct a boom on the same portion of the river where Nicomen, a rival logging company, already operated a boom. *Id.* at 321. The evidence showed that the two competing booms would interfere with one another to an extent where both could not operate at the same time. *Id.* at 323. For instance, North Shore's boom would divert all of Nicomen's logs into North Shore's boom. *Id.* As a result, we held that the two booming operations could not "exist together." *Id.* at 334.

Here, in *WR-SRI*, *Safeway*, and *Sternoff*, Seattle presented expert declarations declaring that the two uses were incompatible with one another. 552 Clerk's Papers (CP) at 1071-73 (expert deposition stating that Seattle would be prevented from operating electrical lines, that there is insufficient room to relocate the wires, and that the condemnation "effectively sever[s] the Transmission Line and renders it useless"); 306 CP at 916 (expert deposition stating that "the net effect of the condemnation

30

would be to render the Transmission Line Easements unusable for their intended purpose and to sever the larger Transmission Line Corridor"). Sound Transit chose not to offer any evidence on the issue of compatibility.[18] Despite Seattle's evidence, the trial courts in *WR-SRI*, *Safeway*, and *Sternoff* made *no* findings regarding whether Sound Transit's proposed use was compatible with Seattle's prior public use.

In *Jacobsen*, however, the trial court made a finding of fact regarding compatibility, stating, "[E]ven if the City of Seattle is deemed to be engaged in a present public use of its easements, that use is consistent with Petitioner's proposed use." 489 CP at 1393. The trial court did not offer any further explanation of this finding. We thus turn to the evidence that the parties presented of compatibility.

Sound Transit presented a declaration of a civil engineer with "experience consulting on projects that involve engineering issues relating to electrical transmission systems." 489 CP at 471. This engineer had knowledge of Seattle's "engineering preferences and requirements relating to the construction of monopoles for its electrical transmission systems." The engineer stated that after the

---

[18] Sound Transit's attorney submitted a declaration in *Safeway* that "[i]t has always been Sound Transit's intention to restore, and thereby preserve, rights over the subject property through a residual electrical transmission easement that allows the City of Seattle ('Seattle') continued use of its existing electrical transmission facilities across the property." 067 CP at 355; *see also* 489 CP at 906-06 (same); 306 CP at 987-88. Sound Transit argues that this qualifies as a CR 2(A) stipulation that the two public uses are compatible. However, the actual condemnation application submitted by Sound Transit seeks to acquire Seattle's property "free and clear of any right, title and interest of all Respondents [property owners]." 552 CP at 6. Even assuming that Sound Transit intends to restore Seattle with a "residual electrical transmission easement," Seattle argues that this will be impossible because the project as planned will leave insufficient room for Seattle to comply with mandatory industry clearance requirements. *See, e.g.*, 067 CP at 355, 285-86. Further proceedings on the question of compatibility are needed.

condemnation, Seattle would be required to use a transmission tower "that is widely accepted in the industry, but is not . . . currently used by Seattle." 489 CP at 473.

In contrast, Seattle presented competing declarations of its employees. One employee stated that the condemnation "would both conflict with and bisect the Transmission Line Easement." 489 CP at 393. This employee further stated that the condemnation "potentially mak[es] it impossible for Seattle to locate the towers necessary to support a future transmission line and/or interfere with Seattle's ability to access the towers supporting its existing transmission line for repairs, maintenance, or expansion." 489 CP at 393-94. Another employee stated that "safety risks and operational issues" made the alternate tower design suggested by Sound Transit "unsuitable." 489 CP at 868. He further stated that the condemnation "would create a break" in the transmission line corridor, and that there would be "insufficient space" for Seattle to make use of the easement. 489 CP at 868-69.

Based on this evidence, we conclude that the trial court's finding regarding compatibility in *Jacobsen* was not supported by substantial evidence. A single deposition, whose conclusions are challenged by two competing depositions, is insufficient to persuade a fair-minded person that the trial court's finding was correct. *See Blackburn*, 186 Wn.2d at 256. There was no trial for the trial court to weigh the credibility of the competing declarations. The issue of compatibility in this case is highly technical, and there is a factually correct answer. Either these two uses are compatible or they are not. This is a matter for the trial court to determine after hearing

32

evidence. As a result, we remand all four cases for the trial court to determine if Sound Transit's proposed use is compatible with Seattle's use of the property.

### c. When Two Public Uses Are Incompatible

We now take this opportunity to provide additional guidance to the trial court on remand in the event that it concludes the two uses as proposed are incompatible. If a court determines that two public uses are incompatible, "then the issue may be about the superiority of rights between *competing* public uses." *Okanogan County PUD*, 182 Wn.2d at 543. In that situation, we have said that we consider the following factors:

> "'the present or prospective use of such property by the condemnee, the prospective use thereof by the condemn[o]r, the comparative advantages flowing to the public as between the ownership thereof by the condemnee and condemn[o]r, and the comparative advantage and disadvantages flowing to the condemnee and condemn[o]r by the ownership of such property.'"

*Id.* (quoting *State ex rel. Wash. Boom Co. v. Chehalis Boom Co.*, 82 Wash. 509, 514, 144 P. 719 (1914)). This test was established over a century ago, and we have never had the opportunity to apply it in practice. Further, we recently called the test into question in *Okanogan County*, noting that "whether [one public use] should outweigh the interests of providing electricity to certain areas is a matter of public policy reserved for the legislature, not the court." *Id.* at 544.

The sole case in which we have found two public uses to be incompatible with one another and ordered a remedy was decided before we established this test. In that case, we concluded that two logging companies attempting to construct booms on the same area of a river would interfere with one another to the extent that they

could not coexist. *Nicomen*, 40 Wash. at 334. We held that the prospective logging company had to restrict its booming operations to an area outside the existing logging company's operations. *Id.* In other words, the remedy that we prescribed in a case of incompatibility was an order that the prospective public use be restricted to an extent that the current public use would be compatible with it. We are persuaded that this is an appropriate remedy in situations where two public uses as proposed are found to be incompatible with one another.

This solution avoids the dangers inherent in "judicial legislating." *Carnation Co. v. Hill*, 115 Wn.2d 184, 189, 796 P.2d 416 (1990). When courts delve into the realm of policymaking, they run the risk of "'mistak[ing] their own predilections for public policy which deserves recognition at law.'" *Green v. Ralee Eng'g Co.*, 19 Cal. 4th 66, 80, 960 P.2d 1046 (1998) (quoting *Gantt v. Sentry Ins.*, 1 Cal. 4th 1083, 1095, 824 P.2d 680 (1992)). As we noted in *Okanogan County PUD*, we are in no position to determine whether one public use outweighs the interests of another public use. 182 Wn.2d at 544. The remedy also enables the public to enjoy both purposes to the greatest extent possible. Here, it is reasonable to hope that both Sound Transit and Seattle may design their projects to conform with and promote one another—in a manner similar to that which Sound Transit and Bellevue have done.

In sum, in the event that the trial courts conclude that Sound Transit's proposed public use is incompatible with Seattle's current public use, they should order that Sound Transit's proposed public use be modified to an extent necessary to enable the two uses to be compatible with one another.

CONCLUSION

In conclusion, Sound Transit has statutory authority to condemn property owned by another political subdivision of the State and the condemnation for the East Link Extension is a public use meeting the test of public necessity. However, the trial courts failed to address the prior public use doctrine and enter findings about the compatibility of the two entities' public uses. As a result, we are unable to determine whether Seattle's use and Sound Transit's use are compatible with one another. Consequently, we affirm in part and remand these cases for consideration of the prior public use doctrine, a determination of whether the public uses are compatible with one another, and any other necessary proceedings consistent with this opinion.

_Wiggins, J._

WE CONCUR.

_Fairhurst, C.J._

_Stephens, J._

_González, J._

_Madsen, J._

_Gordon McCloud, J._

_Owens, J._

_Yu, J._