**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.



FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE JUL 2 8 2016

for CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on July 28, 2016

*[signature]*

**Supreme Court Clerk**

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| PATRICIA BLACKBURN, DAVID CARPENTER, JACOB DAU, DENNIS FANT, BONIFACIO FORNILLOS, AKANELE IMO, JOSE LOPEZ, RALPH PETERSON, and MATTHEW STALEY, | ) ) ) ) ) ) ) ) | |
| Appellants, | ) ) | No. 91494-0 |
| v. | ) ) | EN BANC |
| STATE OF WASHINGTON DEPARTMENT OF SOCIAL AND HEALTH SERVICES and WESTERN STATE HOSPITAL, | ) ) ) ) ) | Filed _____ JUL 2 8 2016 _____ |
| Respondents. | ) ) ) | |

FAIRHURST, J.—Nine employees (Employees) of Western State Hospital (WSH)[1] assert that their employer has illegally taken race into account when making staffing decisions in response to patients' race-based threats or demands. After a six-day bench trial, the trial court found that WSH managers issued a staffing directive that prevented African-American staff from working with a violent patient making

---

[1] WSH is a division of the Department of Social and Health Services. We refer to the respondents collectively as the "State" throughout this opinion.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

threats over the course of one weekend in 2011. Despite this race-based staffing directive, the trial court entered a verdict for the State and dismissed Employees' employment discrimination claims. We reverse the trial court and hold that the State's racially discriminatory staffing directive violates the Washington Law Against Discrimination (WLAD), RCW 49.60.180(3).

## I. FACTS AND PROCEDURAL HISTORY

A.    Facts

This case involves Employees' challenge to alleged discriminatory acts of their employer WSH. WSH is a psychiatric hospital that cares for individuals with serious mental illnesses. WSH patients tend to be aggressive, violent, and psychotic, especially where Employees were staffed. Employees all worked on the evening/swing shift on the same ward (ward F-5) of the Center for Forensic Services at WSH. Employee Patricia Blackburn, a registered nurse (RN), worked as the charge nurse on ward F-5. Her race is Caucasian. The other eight Employees identify as various races and nationalities (African-American, black African, Filipino, and Caucasian). These eight Employees worked as psychiatric security attendants (PSAs) on ward F-5, where they helped care for patients.

Although staff members are generally assigned to work in a particular home ward, they may be reassigned during a shift to work on a different ward based on a

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Blackburn v. State*, No. 91494-0

"'pull list'" that ensures staff members are "pulled away from their home wards on an equal basis." Clerk's Papers (CP) at 2710 (Finding of Fact (FOF) 9).

The trial court's findings focused on a staffing reassignment that involved patient M.P. In 2004, M.P. was admitted to WSH through an adjudication of not guilty by reason of insanity. M.P. was a particularly violent and intimidating patient who had assaulted both patients and staff. He was often delusional as a result of failing to take his medications and had spent significant time in seclusion and restraints. M.P. had a history of methamphetamine abuse, and he suffered from schizoaffective disorder, bipolar, and antisocial personality disorder. M.P. was housed on ward F-8.

M.P.'s violent behaviors and delusions escalated toward the end of March 2011. At that time, M.P. was usually staffed with two attendants during the day and one at night. One of his regular attendants was Marley Mann, an African-American PSA.[2] Andy Prisco was M.P.'s treatment team coordinator. He had worked extensively with M.P. On Friday, April 1, 2011, Prisco reported to RN4 Lila Rooks that M.P. was making credible threats toward Mann. He also quoted M.P.'s comments that he planned to "'f*** up any [n word] working with him.'" CP at 2710 (alteration in original) (FOF 6). Prisco, who was familiar with numerous similar threats, believed that M.P.'s only credible threat directly targeted Mann and

---

[2]Mann is not a party to this action.

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

no one else. The trial court found that "the threats were directed specifically to Mr. Mann." CP at 2710 (FOF 6).

Rooks shared Prisco's report with others. A decision was made that M.P. should not have access to African-American staff during the weekend to ensure staff safety. The trial court found that this decision "was likely an overreaction to Mr. Prisco's reported concerns." CP at 2710 (FOF 7). Rooks communicated the staffing decision to RN3s Barbara Yates and Beth Baltz.

The next day, Yates called Blackburn to reassign three of Blackburn's PSAs to work on other wards. Yates specifically·directed Blackburn to send a white staff person to ward F-8, where M.P. resided. Seven of the nine Employees were working the swing shift on ward F-5 at this time. Blackburn refused to depart from the pull list and noted that the next three employees listed were all persons of color. Blackburn again refused when Yates directed that she send the person "'with the lightest skin.'" CP at 2711 (FOF 10). Yates eventually directed Bonifacio Fornillos to go to ward F-8. Fornillos obeyed this directive and proceeded to work on ward F-8 without incident.

M.P. did not commit any assaults over the weekend of April 2-3, 2011. The trial court found that "the staffing directive ended" on Monday, April 4, 2011, and noted that "none of the plaintiffs have been on a shift in which a similar staffing assignment was made" since that time. CP at 2711 (FOF 12, 14).

4

*Blackburn v. State*, No. 91494-0

B.     Procedural history

Employees initially sued the State for employment discrimination in federal court in 2011, asserting both state and federal law claims. After the State asserted sovereign immunity over the claims under chapter 49.60 RCW, the parties agreed to voluntarily dismiss their state law claims and refile them in Pierce County Superior Court.[3]

The trial court held a six-day bench trial in 2015. The court entered findings of fact and conclusions of law dismissing all of Employees' WLAD claims, issuing a verdict for the defense. The factual findings focused on the particular staffing incident involving patient M.P. over the course of one weekend in April 2011. The court found that this staffing directive ended on April 4, 2011, and that "none of the plaintiffs have been on a shift in which a similar staffing assignment was made" since April 2011. CP at 2711 (FOF 14). The court rejected Employees' disparate treatment claim on two grounds, concluding (1) that they failed to prove a tangible adverse employment action that was severe enough to be actionable and (2) that "safety was the overriding factor" in the staffing directive, rather than race. CP at 2712 (Conclusion of Law (COL) 6). The trial court also dismissed Employees' hostile work environment claim, noting that the staffing directive was not "so severe

---

[3]The State prevailed on summary judgment in federal court on their federal claims, and the United States Court of Appeals for the Ninth Circuit affirmed in an unpublished opinion. *Blackburn v. State of Wash. Dep't of Soc. & Health Servs.*, 611 F. App'x 416 (9th Cir. 2015).

*Blackburn v. State*, No. 91494-0

or pervasive" as to constitute a hostile work environment. CP at 2712 (COL 10); *see also* CP at 2712 (COL 9). Employees sought direct review in this court, which we granted.

## II. ANALYSIS

Employees challenge multiple factual findings and conclusions of law. We review findings of fact for substantial evidence. *Hegwine v. Longview Fibre Co.*, 162 Wn.2d 340, 352, 172 P.3d 688 (2007). As the party challenging the trial court's factual findings, Employees have the burden to prove they are not supported by substantial evidence. *See Fisher Props., Inc. v. Arden-Mayfair, Inc.*, 115 Wn.2d 364, 369, 798 P.2d 799 (1990). "Substantial evidence" means evidence that is sufficient "'to persuade a rational, fair-minded person of the truth of the finding.'" *Hegwine*, 162 Wn.2d at 353 (quoting *In re Estate of Jones*, 152 Wn.2d 1, 8, 93 P.3d 147 (2004)). So long as this substantial evidence standard is met, "a reviewing court will not substitute its judgment for that of the trial court even though it might have resolved a factual dispute differently." *Sunnyside Valley Irrig. Dist. v. Dickie*, 149 Wn.2d 873, 879-80, 73 P.3d 369 (2003). We review conclusions of law de novo. *Robel v. Roundup Corp.*, 148 Wn.2d 35, 42, 59 P.3d 611 (2002); *Hegwine*, 162 Wn.2d at 348, 353.

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Blackburn v. State*, No. 91494-0

A.     Factual challenges

Employees raise various challenges to the trial court's factual findings that generally relate to the duration and frequency of the State's race-based staffing practices. Although the trial court found that the race-based staffing directive lasted only one weekend and that Employees have not been subjected to similar staffing incidents, Employees claim the State maintains a policy of racial staffing that it has used on other occasions.

We find that substantial evidence supports the trial court's factual findings. The trial court weighed the witnesses' testimony and credibility and implicitly determined that other staffing decisions described were not substantially similar to the racial staffing directive at issue in April 2011, which involved a clear communication that no staff members of a certain race were to be assigned to a particular ward over the course of one weekend. Based on our review of the record, Employees' challenges are not sufficient to disturb the trial court's factual findings under the substantial evidence standard.

B.     Legal challenges

Employees claim that the trial court erred in dismissing their disparate treatment and hostile work environment claims. We agree with Employees that the State's explicitly race-based staffing directive constituted facial discrimination in

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Blackburn v. State*, No. 91494-0

violation of RCW 49.60.180(3).

Since 1949, the WLAD has existed to protect individuals from discrimination on the basis of race, among other protected characteristics. The WLAD "shall be construed liberally" to accomplish its antidiscrimination purposes. RCW 49.60.020. RCW 49.60.180 prohibits racial discrimination in employment. At the federal level, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, also contains antidiscrimination provisions with some similar statutory language. Although this case involves claims only under the WLAD, Washington courts often look to federal case law on Title VII when interpreting the WLAD. *See, e.g., Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 180, 23 P.3d 440 (2001). We view Title VII cases as "a source of guidance," but we also recognize that "they are not binding and that we are free to adopt those theories and rationale which best further the purposes and mandates of our state statute." *Grimwood v. Univ. of Puget Sound, Inc.*, 110 Wn.2d 355, 361-62, 753 P.2d 517 (1988).

The WLAD makes it unlawful for an employer "[t]o discriminate against any person in compensation or in other terms or conditions of employment because of . . . race." RCW 49.60.180(3). This case involves claims of disparate treatment under RCW 49.60.180(3). "'"Disparate treatment" . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin.'" *Shannon v. Pay 'N*

8

*Blackburn v. State*, No. 91494-0

*Save Corp.*, 104 Wn.2d 722, 726, 709 P.2d 799 (1985) (alteration in original) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977)).

When an employee makes out a claim of disparate treatment under the WLAD, like Title VII, the employer's action is unlawful unless the employer has a valid justification. *See, e.g., Franklin County Sheriff's Office v. Sellers*, 97 Wn.2d 317, 328-29, 646 P.2d 113 (1982) ("The County's decision to achieve a sexual balance by providing a male counselor and female counselor resulted in the County refusing to hire Sellers because of her sex. As such, the action was prohibited by statute unless it was based upon a bona fide occupational qualification."); *Healey v. Southwood Psychiatric Hosp.*, 78 F.3d 128, 132 (3d. Cir. 1996) (policy of requiring both males and females on all shifts: "When open and explicit use of gender is employed, as is the case here, the systematic discrimination is in effect 'admitted' by the employer, and the case will turn on whether such overt disparate treatment is for some reason justified," such as through affirmative action or a bona fide occupational qualification (BFOQ)); *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Johnson Controls, Inc.*, 499 U.S. 187, 199-200, 111 S. Ct. 1196, 113 L. Ed. 2d 158 (1991) ("Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination . . .

9

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

. The beneficence of an employer's purpose does not undermine the conclusion that an explicit gender-based policy is sex discrimination under [Title VII] and thus may be defended only as a BFOQ.").

The trial court held that Employees' disparate treatment claim failed. We disagree. According to the trial court's findings of fact, the State made staffing decisions that explicitly prevented certain employees from working on a particular ward over the course of one weekend due to their race. Although the trial court found these staffing orders were "likely an overreaction," this does not change the resulting discriminatory nature of the staffing decisions. CP at 2710 (FOF 7). The trial court found that "the decision was made that [M.P.] should not have access to African[-] American staff" and Yates directed that a "white staff person needed to go to F-8," instead of the African-American staff who were next on the pull list. CP at 2710 (FOF 7, 9). These overt race-based directives affected staffing decisions in such a manner as to constitute discrimination in "terms or conditions of employment because of . . . race" in violation of RCW 49.60.180(3). We hold that the trial court erred in concluding otherwise.

We also determine that the State has no valid legal justification for its discrimination. RCW 49.60.180 allows employers to take protected characteristics into account in limited circumstances. *See* RCW 49.60.180(1) (prohibition against discrimination in hiring does not apply if based on a BFOQ), (3) (permitting

10

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

segregated washrooms and locker facilities on the basis of sex and allowing the Human Rights Commission to issue regulations or rulings "for the practical realization of equality of opportunity between the sexes"), (4) (prohibition against discrimination in advertising, job applications, and preemployment inquiries does not apply if based on a BFOQ). In order to satisfy the BFOQ standard, the employer must prove (1) that the protected characteristic is essential to job purposes or (2) that all or substantially all persons with the disqualifying characteristic would be unable to efficiently perform the job. *Hegwine*, 162 Wn.2d at 358.

None of these statutory exceptions apply. RCW 49.60.180(3) allows limited exceptions for classifications only based on sex, not race. And even if the BFOQ defense from RCW 49.60.180(1) or (4) could apply in this case, which is doubtful, the State waived it. CP at 2641; 1 Verbatim Report of Proceedings (Feb. 2, 2015) at 11. The State fails to assert any other defense that our statutes or case law recognize. Therefore, Employees prevail on their disparate treatment claims.

Employees also challenge the trial court's dismissal of their hostile work environment claim. RCW 49.60.180(3) prohibits harassment based on a protected characteristic that rises to the level of a hostile work environment. An employee must demonstrate four elements for a hostile work environment claim: that the harassment (1) was unwelcome, (2) was because of a protected characteristic, (3) affected the terms or conditions of employment, and (4) is imputable to the

11

*Blackburn v. State*, No. 91494-0

employer. *Glasgow v. Ga.-Pac. Corp.*, 103 Wn.2d 403, 406-07, 693 P.2d 708 (1985); *see also Fisher v. Tacoma Sch. Dist. No. 10*, 53 Wn. App. 591, 595-96, 769 P.2d 318 (1989) (extending the hostile work environment standard in *Glasgow* to race-based hostile work environment claims). The trial court held that the employees failed to meet the third element, which requires that "[t]he harassment must be sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment." *Glasgow*, 103 Wn.2d at 406. Harassing conduct has also been described as "severe and persistent," and it must be determined "with regard to the totality of the circumstances." *Id.* at 406-07.[4]

Based on the trial court's factual findings, which we find are supported by substantial evidence, the trial court did not err in dismissing Employees' hostile work environment claim. The trial court applied the correct legal standard and did not err in concluding that the staffing decision over the course of a single weekend did not rise to the level of severe or pervasive harassment.

Employees request relief in the form of damages, declaratory and injunctive relief, interest, attorney fees, and costs. RCW 49.60.030(2) allows successful

---

[4]The Court of Appeals has adopted criteria "[t]o determine whether the harassment is such that it affects the conditions of employment . . . : the frequency and severity of the discriminatory conduct; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Washington v. Boeing Co.*, 105 Wn. App. 1, 10, 19 P.3d 1041 (2000) (citing *Sangster v. Albertson's, Inc.*, 99 Wn. App. 156, 163, 991 P.2d 674 (2000) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993))).

12

*Blackburn v. State*, No. 91494-0

plaintiffs in WLAD actions to recover damages, injunctive relief, costs, and attorney fees. Because we find that Employees have prevailed on their disparate treatment claim and have complied with RAP 18.1 and RCW 49.60.030(2), we remand this case to the trial court to determine the appropriate damages and reasonable attorney fees to award in this case. On remand, the trial court should also consider whether injunctive relief is appropriate and, if so, the trial court will be responsible for crafting the scope of and enforcing any injunction issued.

*Blackburn v. State*, No. 91494-0

Fairhurst, J.

WE CONCUR:

Madsen, C.J.

Johnson, J.

Owens, J.

Stephens, J.

Wiggins, J.

González, J.

Gordon McCloud, J.

Yu, J.