# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| CAMERON INVESTMENTS, INC., a Washington corporation; SAGER DEVELOPMENT, INC.; a Washington corporation; SAGER FAMILY HOMES, INC., a Washington corporation; and JOHN A. BALL and DORA BALL, husband and wife, and the marital community thereof,<br><br>Appellants,<br><br>v.<br><br>REVOCABLE LIVING TRUST OF RAYMOND A. LEVESQUE AND MARILYN A. LEVESQUE by and through its Trustees, Raymond A. Levesque and Marilyn A. Levesque,<br><br>Respondents. | No. 86170-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

MANN, J. — This appeal arises out of a failed real estate purchase and transaction. The Levesque Living Trust and Raymond and Marilyn Levesque (Levesques), and neighbors John and Dora Ball contracted to sell vacant land to Cameron Investments, Inc., a development company controlled by William Sager

(Sager).[1]  The purchase and sale agreement (PSA) anticipated adjusting property boundary lines to facilitate future subdivision and development.  The boundary line adjustments (BLA) and related deeds led to some of the Levesques' property being combined with some of the Balls' property with title to the entire parcel held solely by the Levesques.  Eventually, Sager closed with the Balls to allow them out of the transaction.  Sager then failed to close with Levesque.  The Levesques then sued Sager raising several causes of action including breach of contract and rescission.  After a bench trial, the trial court concluded that the Levesques proved Sager breached the PSA and awarded them the closing extension fees, earnest money, and attorney fees.  The trial court also rescinded the BLA and ordered Sager to restore the original boundary lines.  Sager appeals arguing the trial court made several errors in its findings of fact and conclusions of law.  We affirm.

I

A

The Levesques owned three parcels of property covering several acres in University Place.  The property was mostly vacant except for the Levesques' house.  The Balls also owned three parcels of mostly vacant land that abutted Levesque's property.  The Levesques' and Balls' parcels are located north of 53rd Street and generally depicted as follows:

---

[1] For clarity, we refer to respondents Raymond and Marilyn Levesque and their revocable living trust, as the "Levesques."  We refer to appellants Cameron Investments, Inc., Sager Development, Inc., Sager Family Homes, Inc., and principal William Sager collectively as "Sager."



The Levesques and Balls decided to sell their vacant property and contacted real estate broker Colleen Walker, with Coldwell Banker-Bain. Walker listed the Levesques and Balls properties together to make the properties more marketable to developers. The Levesques and Balls agreed to split the sale proceeds so that the Balls would receive 30 percent and the Levesques would receive 70 percent, irrespective of their actual ownership percentages of the land.

On November 5, 2017, the Balls and Levesques entered into a PSA with another of Sager's entities—Cameron Investments Inc.[2] On November 20, 2007, the parties settled on a purchase price of $1,350,000 for the vacant parcels. This was based on Sager's estimate that the combined properties could be subdivided and create a

---

[2] At first, in July 2017 the Levesques and Balls entered into a purchase and sale agreement with Ascaras—one of Sager's entities—for the sale of the properties. The initial transaction failed after Sager's partner expressed his disinterest in the purchase.

minimum of 24 lots, at a price of $56,250 per lot. The PSA required a deposit of earnest money in the amount of $40,000.

The parties agreed that the closing date would be 30 business days following the approval of a preliminary plat (subdivision), and receipt of site development engineering, and no later than November 30, 2018. The PSA allowed Sager to extend closing for up to one, four-month period with a required payment of $10,000 to the sellers. The PSA anticipated two boundary line adjustments: one to segregate the Levesque home, and one to segregate the Ball home, from the rest of the properties.

On June 18, 2018, the parties executed an addendum agreeing to another BLA to create three new lots along 53rd Street so that Sager could avoid the significant cost of developing the street. The parties agreed that the price of the new lots would be $56,250 each. Sager testified to the reasoning behind the BLAs:

> Because we knew we had six tax parcels to work with. Okay? To do a boundary line adjustment, you cannot add tax parcels. That would be a development. Okay? But you can move parcels around.
>
> So we knew we needed one for Levesque's house, one for Ball's house, and then we needed to get 53rd off of the map. So the only way to do that is to put lots on 53rd that don't require development of 53rd because they're existing lots of record.

On November 27, 2018, the parties agreed to extend closing to March 31, 2019. Extending the closing date required Sager to pay $10,000 to the Balls and Levesques.

On November 29, 2018, the Balls and Levesques signed a record of survey for a BLA that was then recorded in Pierce County on December 17, 2018. The signatures on the BLA of Ball and Levesque were notarized by an employee of Sager. The first two pages of the four-page document, which include the signatures, were dated

-4-

November 29, 2018. The third and fourth pages were dated December 14, 2018. On page three was a map of the parcels showing the proposed changes with revised parcels. Page four contained the original legal descriptions and the revised legal descriptions of the parcels.

The BLA led to the agreed segregation of the Balls and Levesques homes and created the three new lots along 53rd Street. But because the BLA could not create additional parcels beyond six, the remaining property—some belonging to the Levesques and some belonging to the Balls—was combined into a single revised parcel, marked parcel B. The revised boundaries looked generally as follows:



Sager directed his attorney to work with the Levesques and Balls to "make that assemblage happen . . . in order to create the best process forward to take ownership of this assembled parcel." Sager's attorney prepared several quitclaim deeds to reflect the changes made by the BLA and, for reasons not clear in the record, the Balls quitclaimed

their real property interest in revised parcel B to the Levesques. The deeds were recorded on March 13, 2019.

Raymond Levesque testified that while he understood boundary lines would be adjusted, he did not know specifics or how Sager planned to do it. He learned about the combination of the properties into revised parcel B when he and the Balls had an issue paying property taxes. The Levesques paid their property taxes as normal and unexpectedly received a returned payment with notice that those parcels no longer existed. Levesque stated that the combination was a complete surprise to him. Walker testified that she was aware of the BLAs agreed to in the addendums, but did not understand that the result would be a combination of the remaining property into a new parcel owned solely by Levesque. Walker described the map presented to her as showing the three new parcels along 53rd Street and the separation of the residences, but noted she never had a drawing that showed the properties combined into revised parcel B.

In April 2019, the Balls and Levesques sold the three new parcels along 53rd Street to Sager. The parties then executed an addendum reducing the purchase price of the remaining parcel B to $1,181,250. The closing date was extended to September 12, 2019, which entitled the Balls and Levesques to an extension fee of $56,250. Sager did not pay the fee.

In November 2019, the parties again extended closing to no later than January 10, 2020. During this time the Balls were trying to conduct a 1031 exchange and were

increasingly upset by the fact they were no longer on title to property they once owned and had not been paid any money.[3]

In January 2020, the parties and Walker met at the Levesques' home to discuss the transaction. When the BLA was brought up, Sager made no comment on the subject. Sager offered to close with the Balls, but told the Levesques he did not have funds to close their portion of the transaction at that time. To facilitate removing the Balls from the transaction, Sager and the Levesques executed a memorandum of understanding and agreement (MUA).

The MUA provided that Sager would close with the Balls no later than January 17, 2020. The MUA further provided:

> 2. Seller consents to Buyer closing with or otherwise fully performing its obligations to Ball on the scheduled closing date or any mutually agreeable closing date with Ball not to extend beyond January 17, 2020.
>
>    . . . .
>
> 4. The new scheduled closing date for Buyer and Seller is Friday April 29, 2020 . . . The status quo with regard to the current property ownership shall remain unchanged until closing has been successfully consummated.
>
> 5. Consideration pledged and promised by Buyer to Seller in exchange for the requested forbearance and extension includes:
>    - An additional $50,000 payable to Seller which is deemed to be fully earned once this MUA is fully executed but which shall be payable at closing . . .
>    - All addenda items . . . including, without limitation, reimbursement of the tax overpayment paid by Seller, shall be forthwith performed by Buyer within 45 days of the execution of this agreement said activities to commence on or before January 15, 2020.

---

[3] A 1031 exchange is an exchange of like-kind property that is exempt from income tax consequences under the federal tax code, 26 U.S.C. § 1031. BLACK'S LAW DICTIONARY 1771 (11th ed. 2014).

Sager did not pay the Levesques the earned $50,000.

To facilitate the Balls' 1031 exchange, Martin Burns, the qualified intermediary hired by the Balls, together with Balls' attorney, determined the structure of the transaction had to change because the Balls no longer held title to the real property that was subject to the PSA and combined into revised parcel B. The Balls and their attorney contended that the Balls retained an equitable interest in a constructive trust held by Levesque. As a result, the transaction required that the Balls, once again, transfer any interest in the property to the Levesques. During that time, Sager e-mailed Walker asking if the Levesques would release the earnest money because "he's going to be in such a good position owning the land with a $350K down payment . . . essentially releasing $36K for a $350K [earnest money]."

To satisfy the obligation to the Balls, Sager executed a third-party deposit authorization (TPD) for the use and benefit of the Levesques and deposited $336,656.25 into escrow to be paid to the Balls. The funds were dispersed to the Balls and another quitclaim deed was executed transferring any and all of the Balls' interest to the Levesques for the second time. Sager testified that he thought he was purchasing the Balls' 30 percent interest held in a constructive trust and did not expect title of parcel B to change at that time.

On April 28, 2020, Sager notified the Levesques that he could not close and requested the Levesques execute a quitclaim deed conveying the Balls interest to Sager.

B

On June 17, 2020, the Levesques sued Sager for breach of contract and trespass. The Levesques also claimed an implied easement for use of an access road across one of the parcels purchased by Sager and, in the alternative, claimed rescission of the conveyance. The Levesques sought judgment quieting title, declaratory relief, and injunctive relief. Sager asserted affirmative defenses of performance, failure to perform a condition precedent, unclean hands, and estoppel. Sager also counterclaimed for unjust enrichment, conversion, breach of contract, interference with business expectancy, violation of chapter 64.06 RCW, and breach of the duty of good faith and fair dealing.

The Levesques successfully moved for summary judgment on all of Sager's counterclaims except for breach of contract and breach of the duty of good faith and fair dealing.

Following a bench trial, the court made these findings of fact relevant here:

7. Neither the Levesques or the Balls were experienced in real estate development.

20. There was no Addendum mentioning the combining of properties owned by the Balls with properties owned by the Levesques.

22. The Levesques' and Balls' signature were purportedly notarized by Melinda Meyer, who is an employee of Sager Family Homes.

24. Ms. Meyer testified that she generally is the backup notary for matters involving Sager and generally notarizes at the Sager Family Home offices, which were located at all relevant times on Pacific Avenue in Tacoma.

25. Levesque testified that he had never been to the Sager Family Home offices to sign documents or have documents notarized. Melinda Meyer does not recall ever notarizing documents at Levesque's home.

34. Levesque testified that in the Spring of 2019 he learned that there was an issue with the taxes on his property being rejected. Mr. Levesque then spoke with John Ball and the two of them went to the County annex and learned that the historical parcels that had been in existence when they entered into the PSA with Sager no longer existed, and that the lots had been combined.

54. On January 16, 2020, Sager (as "Depositor") executed a Third-Party Authorization for the benefit of [the] Levesque Living Trust, whereby Sager was able to tender funds to escrow for the closing out of Ball. In that authorization, Sager represented that it understood "Settlement Agent is authorized to use the Funds for the contemplated purchase as instructed by the benefited party, without further contact with or instruction from Depositor."

55. Sager further agreed, "Depositor acknowledges that the use of the Funds to acquire property through this escrow will not result in Depositor having any right, title or interest in the subject property."

The trial court concluded that the Levesques proved breach of contract by preponderance of the evidence. The court also concluded that Sager did not prove its counterclaims for breach of contract or breach of the duty of good faith and fair dealing.

The trial court made the following additional conclusions of law:

8. The court concludes that nowhere in the [PSA] do the parties agree to conduct a [BLA] to combine Balls' property with Levesques' properties. Although not stated in the [PSA], the combined properties may still be proper if all parties knowingly consented to the combining.

9. The Court concludes that the Levesques did not knowingly, or with knowledge, agree to the [BLA] to combine the properties. There are questions about the execution of the [BLA] document and whether it was properly signed before a notary, moreover it appears that at least one page that was included in the recorded version of the [BLA] (a plat map / survey) was dated after the [BLA] document was signed. More specifically, the [BLA] document was purportedly signed by Balls and Levesques, with their signatures notarized, on November 29, 2018. Yet the third page of the [BLA] document was dated 12/14/2018, more than two weeks after their purported signings. These issues, coupled with the testimony that there was surprise when the tax issue arose with the testimony that Sager was silent on the issue during the January 2020 meeting, leads the Court to conclude that the [BLA] was not obtained by

-10-

Sager in good faith nor did Sager inform the Balls or Levesques of his intent and purpose of the [BLA].

24. The Court concludes that Sager cannot be allowed to benefit for his failure to close the transaction on April 29, 2020.

25. The Court concludes that Sager cannot receive any interest in Parcel B, the subject property (30% or otherwise).

26. The Court concludes that on January 16, 2020, Sager (as "Depositor") disclaimed any interest in the property via executed of a Third-Party Authorization which stated, "Depositor acknowledges that the use of the Funds to acquire property through this escrow will not result in Depositor having any right, title or interest in the subject property."

27. The Court concludes that Sager was required to buy 100% of the subject property, not a fractional share. Any decision allowing Sager to obtain an interest in the property award in essence reward him for his failure to close the sale with Levesque.

29. The Court concludes that there is no Addendum nor any written Agreement that Levesque agreed to become partners with Sager in owning the real property known as Parcel B.

31. The Court concludes that it has the power and authority to rescind the combining of the Levesque and Ball properties and restore the parcels to their pre-conveyance positions.

32. The Court concludes that Sager is entitled to Balls' pre-boundary line adjustment properties, taking into consideration that this portion of the Court's ruling is not intended to affect Sager's purchase of Lots C, D and E.

The trial court entered judgment for the Levesques in the total amount of $371,901.72. The award consisted of $40,000 earnest money, $10,000 for the March 2019 extension, $56,250 for the August 2019 extension, $50,000 for the MUA extension, interest, and attorney fees and costs to the Levesques as the prevailing party. The court rescinded the combining of the Levesques' and Balls' properties and

-11-

ordered Sager to bear the cost of re-establishing the original boundary lines.  The court ordered Sager to pay 30 percent of the taxes on the combined parcel until severed.

Sager filed a notice of appeal seeking review by Division Two of this court. Division Two transferred the matter to this court for review.

II

This court reviews findings of fact under a substantial evidence standard. Blackburn v. State, 186 Wn.2d 250, 256, 375 P.3d 1076 (2016).  The party challenging the trial court's factual findings has the burden to prove they are not supported by substantial evidence.  Blackburn, 186 Wn.2d at 256.  Evidence is substantial if it is enough to "'persuade a rational, fair-minded person of the truth of the finding.'" Blackburn, 186 Wn.2d at 256 (quoting Hegwine v. Longview Fibre Co., 162 Wn.2d 340, 353, 172 P.3d 688 (2007)).  If this standard is met, this court "'will not substitute its judgment for that of the trial court even though it might have resolved a factual dispute differently.'"  Blackburn, 186 Wn.2d at 256 (quoting Sunnyside Valley Irrig. Dist. v. Dickie, 149 Wn.2d 873, 879-80, 73 P.3d 369 (2003)).

Conclusions of law are reviewed de novo.  Blackburn, 186 Wn.2d at 256. Unchallenged conclusions of law become the law of the case and should not be disturbed on appeal.  King Aircraft Sales, Inc. v. Lane, 68 Wn. App. 706, 716-17, 846 P.2d 550 (1993).  Unchallenged findings of fact are verities on appeal.  State v. O'Neill, 148 Wn.2d 564, 571, 62 P.3d 489 (2003).

A

Sager assigns error to the trial court's conclusions that the PSA does not include an agreement to combine the Balls and Levesques properties and that Levesque did not knowingly agree to the combining of properties.

Sager argues that the trial court's findings that there was no agreement on the combining of properties and that Levesque first learned of the combination in spring 2019 are not supported by substantial evidence. Sager contends the evidence shows that Levesque knew the BLA would combine properties because the map attached to the addendum providing the sale price and closing date for the three lots along 53rd Street shows the BLA combining of the properties and it was initialed by Levesque. Sager asserts the only evidence that the Levesques did not know about the properties combining was his testimony to that effect. We disagree.

Substantial evidence supports the trial court's findings. None of the addendums which discuss BLAs provide for or address the combination of properties. Nor do they provide that title to revised parcel B would be held solely by the Levesques. Levesque, who is inexperienced in real estate development, testified that he did not know the specifics of the BLA and left it up to Sager. Sager, an experienced developer, was the party obligated to perform the BLA, the execution of which raised questions about the legitimacy of the signatures, notarization, and date. Additionally, Sager's attorney prepared the deeds that changed ownership of the property subject to the BLA. Levesque testified he was unaware of the combination of properties until the issues with the property tax arose. The Levesques paid incorrect property taxes based on their original ownership—showing they did not know their ownership had changed.

-13-

Testimony by Walker supports that a combined parcel B in the sole ownership of the Levesques was a surprise result of the BLA.

Although the addendum providing for the sale of the three new lots included a map showing the reconfigured parcels and the original boundary lines, the addendum does not describe the combination of the properties and mentions revised parcel B only to the extent that it is to close as agreed to in the PSA. The map alone does little to support Sager's contention that Levesque knew the properties were combined. Nor does the addendum reference or incorporate the BLA. The addendum was also executed months after the BLA was signed and recorded. The evidence is enough to persuade a rational, fair-minded person that Levesque did not know of or consent to the combination of properties in revised parcel B.

Sager argues that the trial court erred in determining Sager obtained the BLA in bad faith. Because we agree with the trial court's conclusion that Levesque did not knowingly agree to the BLA, we do not reach whether Sager acted in bad faith.

Because there was no mention of the combination of properties in the PSA or the addendums, and because there is substantial evidence that Levesque did not knowingly agree to the combination, the trial court did not err.

B

Sager argues the trial court erred in concluding he failed to prove by a preponderance of the evidence that the Levesques materially breached the contract, thus excusing Sager's performance. Sager asserts that the Levesques breached the PSA by consenting to the sale of the Balls' interest in the MUA. And by doing so, they deprived Sager of a reasonably expected benefit and released him from his obligation to

-14-

perform.  Sager cites the Restatement (Second) of Contracts (Am. L. Inst. 1981) and an unpublished Division Three opinion and characterizes the MUA and PSA as two agreements to sell the same property to two buyers.  Sager also argues that Levesque, by entering into the transaction with Ball, did not comply with the standards of good faith and fair dealing.  We disagree.

"A material breach is one "serious enough to justify the other party in abandoning the contract. . . . one that substantially defeats the purpose of the contract."  Park Ave. Condo. Owners Ass'n v. Buchan Devs., LLC, 117 Wn. App. 369, 383, 71 P.3d 692 (2003).  "The burden of proof is upon defendant to prove an affirmative defense based upon plaintiff's nonperformance under the contract."  Wlasiuk v. Whirlpool Corp., 81 Wn. App. 163, 179, 914 P.2d 102 (1996) (citing Wise v. Farden, 53 Wn.2d 162, 169, 332 P.2d 454 (1958)).  The Restatement provides:

> In determining whether a failure to render or to offer performance is material, the following circumstances are significant:
>
> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

RESTATEMENT (SECOND) OF CONTRACTS § 241 (AM. L. INST. 1981).

Sager fails to show it was more likely than not that Levesque materially breached the PSA.  As stated in the MUA, Levesque remained willing and able to fully perform

under the PSA. Contrary to Sager's assertion, Levesque consented to Sager fully performing their obligations to Ball and otherwise made no promises as to Ball's interest before Levesque closed with Sager. The parties agreed that the existing property ownership would not change until Levesque and Sager closed. Nothing Levesque did deprived Sager of the benefit reasonably expected by Sager under the PSA and MUA.

Sager provides no evidence Levesque acted in violation of the duty of good faith and fair dealing by executing the MUA. Levesque already held title to all of revised parcel B—by deeds prepared by Sager's attorney at Sager's direction—before the 2020 transaction with Ball. Levesque's obligations under the MUA were to allow Sager to perform as to Ball and to refrain from declaring default and allow extension of the closing date in exchange for $50,000—which Sager did not pay. As to the PSA, there is no evidence that Levesque did not or could not fully perform his obligations. The duty "requires only that the parties perform in good faith the obligations imposed by their agreement." Badgett v. Sec. State Bank, 116 Wn.2d 563, 569, 807 P.2d 356 (1991). Levesque did not breach the duty of good faith and fair dealing.

While Sager may have believed he was acquiring a 30 percent interest in revised parcel B, we look to what was written in the PSA to determine the intent of the parties. Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 504, 115 P.3d 262 (2005). Sager contracted to acquire all of revised parcel B and nothing Levesque did would have deprived Sager of that benefit had the transaction closed. As the trial court concluded, "Sager was required to buy 100% of the subject property, not a fractional share" and there was "no written Agreement that Levesque agreed to become partners

-16-

with Sager in owning" revised parcel B.  Sager does not challenge these conclusions thus it becomes the law of the case.  King Aircraft Sales, 68 Wn. App. at 716-17.

We agree with the trial court's determination that Sager failed to prove its claim for breach of contract, material breach, and breach of the duty of good faith and fair dealing by a preponderance of the evidence.

C

Sager argues the trial court erred by concluding he disclaimed interest in revised parcel B via the TPD.  Sager recharacterizes the issue as one of waiver and argues that he did not waive his rights under the MUA or PSA because he did not know Levesque was substituted as the buyer.

Washington follows the objective manifestation theory of contracts.  Hearst Commc'ns, 154 Wn.2d at 503.  Under this theory, courts determine the parties' intent from the reasonable meaning of the words used rather than the unexpressed subjective intent of parties.  Hearst Commc'ns, 154 Wn.2d at 503.  Words are generally given their ordinary, usual, and popular meaning unless the entirety of the agreement shows a contrary intent.  Hearst Commc'ns, 154 Wn.2d at 504.  Courts do not interpret what was intended to be written but what was written.  Hearst Commc'ns, Inc., 154 Wn.2d at 504.

Here, looking to the words used, Sager expressly authorized the deposit of funds for the use and benefit of Levesque.  Moreover, the terms of the TPD are clear, "[Sager] acknowledges that the use of [f]unds to acquire property through this escrow will not result in [Sager] having any right, title or interest in the [revised parcel B]."  Sager himself characterized the funds as earnest money and a down payment as to the whole transaction without mentioning Ball's specific interest or the so called "constructive trust"

-17-

interest. Sager's execution of the TPD did not prevent either Levesque or Sager from performing under the PSA. Had the transaction closed, Sager would have received the full benefit of his bargain.

The trial court did not err in concluding that Sager disclaimed any interest in revised parcel B by executing the TPD.

III

Sager argues the trial court erred in not awarding his attorney fees as a substantially prevailing party because he was awarded the portion of parcel B of the Balls' property. We disagree.

"Fees may be awarded as part of the cost of litigation when there is a contract, statute, or recognized ground in equity for awarding such fees." Thompson v. Lennox, 151 Wn. App. 479, 491, 212 P.3d 597 (2009). In an action on a contract where the contract provides for awarding attorney fees to the prevailing party, the prevailing party shall be entitled to reasonable attorney fees and "prevailing party" means the party whose favor final judgment is rendered. RCW 4.84.330.

Here, the PSA specifically provides for the award of attorney fees to the prevailing party. Although the court concluded that Sager was entitled to the Balls' pre-BLA properties, the final judgment was in favor of Levesque and did not include an order as to Sager's interest. Instead, Sager was ordered to establish an easement, re-establish the original boundary lines, pay Levesque the extension fees agreed to in the PSA, and pay taxes on the combined parcels until severed.

The trial court did not err in awarding prevailing party attorney fees and costs to Levesque.

Levesque seeks attorney fees and expenses on appeal under RAP 18.1.  As the prevailing party on appeal and pursuant to the PSA, Levesque is entitled to attorney fees and costs.

We affirm.

_____Mann, J._____

WE CONCUR:

_____Birk, J._____          _____Smith, C.J._____